No. 23-2891

**UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT**

**UNITED STATES OF AMERICA,**
              **Plaintiff-Appellee,**

              **v.**

**MATTHEW RICE**
              **Defendant-Appellant**

Appeal from the United States District Court
for the Northern District of Indiana
Case No.  3:22-CR-36
The Honorable Judge Jon E. DeGuilio

**BRIEF AND REQUIRED SHORT APPENDIX
OF DEFENDANT-APPELLANT MATTHEW RICE**

Northern District of Indiana
Federal Community Defenders, Inc.
Chad J. Pennington
Attorney for Defendant-Appellant
Matthew Rice

200 E. Main Street, Suite 905
Fort Wayne, IN 46802
Telephone: (260) 422-9940
Fax: (260) 422-9954
Email: Chad_Pennington@fd.org

**Oral Argument Requested**

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-2891

Short Caption: United States v. Matthew Rice

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Matthew Rice

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Chad J. Pennington, NDI Federal Community Defenders, Inc., 200 W. Main Street, Suite 905, Fort Wayne, IN  46802

Scott J. Frankel, NDI Federal Community Defenders, Inc., 130 S. Main Street, Suite 300, South Bend, IN  46601

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: s/ Chad J. Pennington    Date: October 4, 2023

Attorney's Printed Name: Chad J. Pennington

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☑    No ☐

Address: 200 W. Main Street, Suite 905, Fort Wayne, IN  46802

Phone Number: (260) 422-9940    Fax Number: (260) 422-9954

E-Mail Address: Chad_Pennington@fd.org

## TABLE OF CONTENTS

**PAGE**

Appearance & Circuit Rule 26.1 Disclosure Statement ................................. i

Table of Contents ............................................................................................ ii

Table of Authorities ...................................................................................... iii

I. Introduction ................................................................................................ 1

II. Jurisdictional Statement .......................................................................... 8

III. Issue Presented ...................................................................................... 10

IV. Case Statement ....................................................................................... 10

V. Argument Summary ................................................................................. 19

VI. Standard of Review ................................................................................ 23

VII. Argument ............................................................................................... 24

    A. Congress passed § 922(g)(1) to keep firearms out of the hands of the public generally ............................................................................. 27

    B. Mr. Rice's conduct of possession of a firearm falls within the Second Amendment's plain text. ...................................................... 29

    C. Mr. Rice remains part of "the People" the Second Amendment protects. ...................................................................................... 33

    D. The government cannot affirmatively show that Mr. Rice's disarming is rooted in the nation's founding-era history and traditions ...................... 37

        1. The District Court erred in finding that the government proffered sufficient historical evidence that § 922(g)(1)'s application to Mr. Rice was consistent with the national historical tradition of firearm regulation .................................................................................... 39

        2. The District Court failed to apply the historical evidence consistent with *Atkinson* ........................................................................ 47

VIII. Conclusion ............................................................................................ 50

IX. Statement Concerning Oral Argument................................................. 50

Certificate of Compliance with F.R.A.P. Rule 32(a)(7)(C)........................... 52

Certificate of Service.................................................................. 53

## TABLE OF AUTHORITIES

**CASES**                                                                     **PAGE**

*Atkinson v. Garland*, 70 F.4th 1018 (7th Cir. 2023)............................ *Passim*

*Austin v. United States*, 509 U.S. 602, 613 (1993) ..................................... 40

*Class v. United States*, 583 U.S. 798, 806 (2018).................................... 23

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ........................... *Passim*

*Huddleston v. United States*, 415 U.S. 814, 819 (1974) .......................... 28

*Kanter v. Barr,* 919 F.3d 437 (7th Cir. 2019)................................... *Passim*

*Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50, n.10 (1961)................... 25

*Lewis v. United States*, 445 U.S. 55, 63 (1980) ..................................... 7

*McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010)............................ 35

*Medina v. Whitaker*, 913 F.3d 152, 158, 160 (D.C. Cir. 2019) ............... 13, 41

*NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, (1937) ........................ 7

*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022) ...................... *Passim*

*Oliver v. United States*, 951 F.3d 841, 847 (2020).................................. 23

*Presser v. Illinois*, 116 U.S. 252, 265 (1886) ..................................... 27

*Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023)......................... *Passim*

*United States v. Bean*, 537 U.S. 71, 75 n.3 (2002) ................................. 1

*United States v. Booker*, 644 F.3d 12, 24 (1st Cir. 2011)............................ 7

*United States v. Bullock*, --- F. Supp. 3d ---, 2023 WL 4232309, at *19-20 (S.D. Miss. June 28, 2023) .................................................................................................. 30, 37

*United States v. Chester, 628 F.3d 673, 679 (4th Cir. 2010)* ...................................... 45

*United States v. Coombes*, 629 F. Supp. 1149, 1158 (N.D. Okla. Sept. 21, 2022) ..... 18

*United States v. Cruikshank,* 92 U.S. 542, 55 (1875) ................................................. 27

*United States v. Daniels,* 77 F.4th 337, 342 (5th Cir. 2023)……………..………..35, 36

*United States v. Diaz*, Case No. 1:20-cr-00597, 2023 WL 8019691, *5 (N.D. Ill. Nov. 20, 2023) .................................................................................................. 31, 34

*United States v. Forbis*, --- F. Supp. 3d ---, 2023 WL 5971142, *3 (N.D. Okla. Aug. 17, 2023) ................................................................................................................ 30

*United States v. Griffin*, Case No. 21-cr-00693, 2023 WL 8281563, *4 (N.D. Ill. Nov. 30, 2023) ................................................................................................................ 30

*United States v. Harper*, No. 1:21-CR-0236, 2023 WL 5672311, at *6 (E.D. Pa. Sept. 1, 2023) ................................................................................................................... 30

*United States v. Jackson*, 69 F.4th 495, 502 (8th Cir. 2023) ....................................... 20

*United States v. Leblanc*, --- F. Supp.3d ----, 2023 WL 8756694, at *5 (M.D. La. Dec. 19, 2023) .............................................................................................................. 31

*United States v. Meza-Rodriguez*, 798, F.3d 664, 669 (7th Cir. 2015) ................. 23, 34

*United States v. Miles*, 86 F.4th 734, 740 (7th Cir. 2023) .................................... 19, 23

*United States v. Prince*, No. 22 CR 240, 2023 WL 7220127, * 4-5 (N.D. Ill. Nov. 2, 2023) ...............................................................................................................*passim*

*United States v. Quailes*, --- F. Supp. 3d ---, 2023 WL 5401733, *8 (E.D. Pa. Oct. 21, 2023) ................................................................................................................ 30, 31

*United States v. Rahimi*, 61 F.4th 443, 454 (5th Cir. 2023) ................................. 29, 34

*United States v. Rowson*, 652 F. Supp. 3d 436, 464 (S.D.N.Y. Jan. 26, 2023) .......... 14

*United States v. Salme-Negrete*, Case No. 1:22-cr-00637, 2023 WL 7325888, *5 (N.D. Ill. Nov. 7, 2023) ................................................................................................... 30

*United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) ............................... *Passim*

*United States v. Verdugo–Urquidez*, 494 U.S. 259, 265 (1990) ................................. 34

*United States v. Yancey*, 621 F.3d 681, 683 (7th Cir. 2010) ...................................... 28

*Vincent v. Garland*, 80 F.4th 1197, 1202 (10th Cir. 2023) ......................................... 20

**STATUTES**

18 U.S.C. § 922(g) ......................................................................................................... 28

18 U.S.C. § 922(g)(1) .............................................................................................. *Passim*

18 U.S.C. § 922(g)(8) ....................................................................................................29

18 U.S.C. § 922(g)(3) .....................................................................................................35

18 U.S.C. § 924(a)(8) ..................................................................................................... 21

18 U.S.C. § 925(c) ............................................................................................................ 1

18 U.S.C. § 3231 .............................................................................................................. 8

18 U.S.C. § 3742 .............................................................................................................. 8

28 U.S.C. § 1291 .............................................................................................................. 8

28 U.S.C. § 2106 .............................................................................................................. 8

**OTHER AUTHORITIES**
**Rules**

Federal Rule of Appellate Procedure 4(b)(1)(A)(i) ...................................................... 9

Federal Rule of Appellate Procedure 34(a) ............................................................... 50

Federal Rule of Appellate Procedure 34(f) ................................................................ 50

Federal Rule of Criminal Procedure 11 ...................................................................... 23

Federal Rule of Criminal Procedure 11(a)(2) ............................................................ 23

Federal Rule of Criminal Procedure 12 ...................................................................... 12

## Secondary

Adam Winkler, *Heller's Catch-22*, 56 UCLA L. Rev. 1551, 1563 (2009) .................. 42

C. Kevin Marshall*, Why Can't Martha Stewart Have A Gun?*, 32 Harv. J. L. & Pub. Pol'y 695, 708 (2009)........................................................................................ 42

Carlton F.W. Larson, *Four Exceptions in Search of A Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1376 (2009)......................... 42

Franklin E. Zimring, *Firearms and Federal Law: The Gun Control Act of 1968*, 4 Journal of Legal Studies 133, 135 (1975).  ............................................................... 42

Lawrence Rosenthal, *The Limits of Second Amendment Originalism and the Constitutional Case for Gun Control,* 92 Wash. U. L. Rev. 1187, 1211 (2015).......... 42

Nelson Lund, *The Second Amendment, Heller, and Originalist Jurisprudence,* 56 UCLA L. Rev. 1343, 1357 (2009)............................................................................. 42

United States Sentencing Commission, *What Do Federal Firearm Offenses Really Look Like*, at p. 2 (July 2022) ....................................................................................... 5

## Constitutional

U.S. Const. amend. II ....................................................................................*passim*

# I.   INTRODUCTION

To use a baseball analogy, one qualifying conviction, and you are out. Out in the sense that, in practice, under 18 U.S.C. § 922(g)(1), Congress, in 1968, created a statute that prohibits, in fact criminalizes, firearm possession by a person convicted of *any* crime punishable by a prison term greater than one-year.[1] Out in the sense that in practice, the qualifying conviction results in the person's permanent loss of their Second Amendment right to possess a firearm.[2]

---

[1] Section 922(g)(1) in full provides: "It shall be unlawful for any person who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."

[2] Congress has created an escape hatch, whereby a prohibited person under § 922(g)(1), may petition the Attorney General to restore their firearm rights, and seek judicial review of the Attorney General's adverse decision. *See* 18 U.S.C. § 925(c). However, Congress has not funded § 925(c)'s administration since 1992. *See United States v. Bean*, 537 U.S. 71, 75 n.3 (2002). Accordingly, there is no federal administrative restoration process in place for prohibited persons like Mr. Rice.

Further, analytically, § 925(c) places the burden on the restoration applicant to demonstrate to the Attorney General's "satisfaction that the circumstances regarding the disability, and the applicant's record and reputation, are such that the applicant will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest." By placing the burden on the restoration applicant, § 925(c) is not similar to the "shall-issue" firearm licensing regimes Justice Kavanaugh appears to have endorsed in his *Bruen* concurrence. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2162 (2022). Section 925(c), if functioning, would operate in the same "may-issue" manner found to be constitutionally problematic in *Bruen*, by imposing the burden

Under § 922(g)(1), the nature of the qualifying offense of conviction is immaterial. It does not matter whether the conviction resulted in a direct harm. It does not matter how long ago the conviction was. It does not matter when the conduct underlying the conviction occurred. The only limiting provision is whether the offense may be punished with more than one-year in custody.

To that end, in practice, post-conviction, it does not matter why a person may request, or *need*, to possess a firearm today or in the future. Acquiring or possessing a firearm within the home for self-defense – illegal. Acquiring or possessing a firearm within the home for defense of family – illegal. Acquiring or possessing a firearm for defense of property within the home – illegal. Acquiring and possessing a firearm for defense of self in public – illegal. Through § 922(g)(1), Congress has determined that all qualifying convictions result in the same

---

on the restoration applicant, while providing the Attorney General considerable discretion. *See Bruen*, 142 S. Ct. at 2138, n.9; *see also Bruen*, 142 S. Ct. at 2156 (the Supreme Court stating that it "know[s] of no other constitutional right that an individual may exercise only after demonstrating to government officers some special need. That is not how the First Amendment works when it comes to unpopular speech or the free exercise of religion. It is not how the Sixth Amendment works when it comes to a defendant's right to confront the witnesses against him. And it is not how the Second Amendment works when it comes to public carry for self-defense.").

constitutional deprivation: The permanent loss of the Second Amendment right to possess a firearm, and criminal prosecution for the exercise of that right.

The law sweeps broadly. It does not distinguish between prior violent convictions or non-violent convictions. It does not distinguish between prior convictions based on community risk. It does not distinguish between prior convictions based on a metric of dangerousness.

The same is true in Matthew's Rice case. In 2009, Indiana authorities convicted him of felony operating a vehicle as a habitual traffic violator. *See* R. 33, p. 1. In 2011, Indiana authorities convicted him of operating a motor vehicle after permanent license forfeiture. *See id.* Because the offenses were punishable by a prison term greater than one-year, under § 922(g)(1), Congress has authorized his permanent loss of Second Amendment rights and the instant prosecution for the exercise of that right. *See id.*

Under § 922(g)(1), once Matthew Rice had been convicted of a qualifying offense in 2009, no matter how temporarily attenuated, no matter on what non-violent or non-dangerous grounds, he was in

practice permanently barred from possessing a firearm. Strike one, and he was Second Amendment out.

Would the same be true under the other Bill of Rights protections? For example, could Congress permanently chill Mr. Rice's speech because he had been convicted of a non-violent offense punishable by a term of imprisonment greater than one-year? Could Congress permanently eliminate Mr. Rice's practice of a particular religious preference based on his not-recent convictions for driving related offenses punishable by a term of imprisonment greater than one-year? Congress has not claimed the authority to permanently subject a person to unreasonable search and seizure based on such a conviction. Congress has not claimed the authority to permanently eliminate a person's right to trial counsel based on any qualifying conviction. The First, Fourth, and Sixth Amendments prevent Congress from doing so.

But, in the Second Amendment context, through § 922(g)(1), Congress has staked a constitutionally incomparable plenary regulatory claim. One qualifying conviction, and Congress has determined the person's Second Amendment rights must be revoked, permanently. The same is not true of other Bill of Rights protections. It should not be true

4

in the Second Amendment context, and if the Second Amendment provides equal constitutional protection as the other Bill of Rights provisions, as the Supreme Court has assured, it *cannot* be true in the Second Amendment context.

As stated in other recent Second Amendment appeals, whether *Bruen's* text and history test requires a reworking of federal firearm laws has yet to be determined, however, there is no doubt that the Supreme Court granted certiorari and decided *Bruen* the way it did because, it believed something was missed post-*Heller* and needed to be changed. *See District of Columbia v. Heller*, 554 U.S. 570 (2008). The same is true in this case.

Section 922(g)(1) is among the most charged federal offenses generally, and "firearm offenses are among the most common crimes prosecuted and sentenced in federal court." United States Sentencing Commission, *What Do Federal Firearm Offenses Really Look Like*, p. 2 (July 2022). The statute may very well be the linchpin of federal firearm criminal enforcement. Indeed, federal law enforcement may be structured to facilitate the statute's enforcement. The federal judiciary may be accustomed to sentencing under the statute. United States

Probation may be comfortable with the statute's application in the United States Sentencing Guidelines.

But, Congress's purported salutary interest in passing the statute and the statute's regulatory salience are no longer germane Second Amendment considerations under *Bruen*. Section 922(g)(1)'s utility is no longer constitutionally relevant. In *Bruen*, the Supreme Court signaled that legislatures had been overreaching in regulating firearms and constitutional text and founding-era history was the corrective the judiciary must apply to rescale a legislature's overwrought interest.

Section 922(g)(1) may be common, it may be a familiar statute for federal institutional actors, and there may now be a substantial effort dedicated to its enforcement, but the statute is also subject to the changed judicial framework the Supreme Court has mandated under the Second Amendment applying *Bruen*. Applying that change, § 922(g)(1) fails.

It fails because its breadth, and application are redolent of a different, and now rejected, period in national firearm experience, regulation, and history. The statute is "firmly rooted in the twentieth century" and reflects a distinct mid-twentieth century constitutional

perspective: That Congress retains near-unassailable authority to regulate firearm possession, and the Second Amendment confers only a limited, if not *de minimus*, individual right to possess a firearm. *United States v. Booker*, 644 F.3d 12, 24 (1st Cir. 2011); *see e.g., Lewis v. United States*, 445 U.S. 55, 63 (1980) (the Supreme Court affirming that Congress, then, had the authority to pass "a sweeping prophylaxis . . . against misuse of firearms."); *see also Range v. Attorney General*, 69 F.4th 69, 109 (3d Cir. 2023) (en banc) (Porter, J., concurring) (noting that the federal firearm regulatory landscape changed in 1937, "when the Supreme Court adopted an expansive conception of the Commerce Clause.") (citing *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, (1937)).  Indeed, it is no wonder § 922(g)(1) is so broad considering Congress passed the statute well before the Supreme Court had confirmed the Second Amendment's text as conferring a preexisting individual right. The statute's broad sweep is a mid-twentieth century innovation without a pre-twentieth century analogue.

The statute fails because, as a firearm regulation, it is inconsistent with the national history of firearm regulation and tradition from the time of the Founding. Legislatures disarmed in 1791.

7

Legislatures did not disarm on the scale, scope, and extent of § 922(g)(1) during the founding-era.

As set forth below, § 922(g)(1) fails here because there is no supporting founding-era history or tradition supporting the permanent disarmament and criminal prosecution of Matthew Rice based on his minimal, non-violent, criminal history.

## II.   JURISDICTIONAL STATEMENT

The District Court exercised subject matter jurisdiction over Mr. Rice's criminal case pursuant to 18 U.S.C. § 3231. This Court exercises appellate jurisdiction over his direct appeal under 28 U.S.C. §§ 1291, 2106, and 18 U.S.C. § 3742.

On January 6, 2023, Mr. Rice moved to dismiss the single § 922(g)(1) count contained in the indictment under the Second Amendment. R. 10; R. 21. On March 17, 2023, the District Court denied his motion. R. 40; *see also* App. pp. 10-31 (order on direct appeal).

On May 22, 2023, the District Court accepted Mr. Rice's guilty plea on the single count. R. 50. Mr. Rice pled guilty without a plea agreement or appellate waiver provision.

On September 21, 2023, the District Court entered judgment on the single § 922(g)(1) count. R. 64, pp. 1-3; *see also* App. pp. 4-6. The District Court imposed a time-served custodial sentence (approximately 17 months custody), with 24 months of supervised release to follow. R. 7; R. 64, pp. 1-3; *see also* App. pp. 4-6.

On September 28, 2023, Mr. Rice filed a timely notice of appeal pursuant to Federal Rule of Appellate Procedure 4(b)(1)(A)(i). R. 66. On September 29, 2023, this Court docketed Mr. Rice's criminal case, and set November 8, 2023, as his opening Appellant brief deadline. DE 1. On November 1, 2023, Mr. Rice moved for a time enlargement to file his opening brief, DE 4, which this Court granted, setting November 16, 2023, as the Appellant opening brief deadline. DE 6. On November 8, 2023, and December 7, 2023, this Court further extended Mr. Rice's opening brief deadline. DE 7, 10. Mr. Rice now timely submits his opening Appellant brief challenging the District Court's denial of his

motion to dismiss the single count of the indictment under the Second

Amendment.[3]

## III.   ISSUE PRESENTED

Whether the government affirmatively proved that § 922(g)(1),

facially or as-applied, violates the Second Amendment under the *Bruen*

text and history standard?

The District Court erred in concluding that the government had

affirmatively shown that § 922(g)(1) satisfied the *Bruen* text and history

test facially and as applied.

## IV.   CASE STATEMENT

On April 25, 2022, the government filed a criminal complaint

against Mr. Rice. R. 1. On May 11, 2022, the government filed the

indictment against Mr. Rice, charging him with a single count under §

922(g)(1). R. 10; *see also* App. pp. 2-3. The indictment alleged Mr. Rice

possessed a firearm in early April 2022. R. 10; *see also* App. pp. 2-3. As

noted, Mr. Rice had been convicted in Indiana, in 2009 and 2011, of two

---

[3] "R." refers to the District Court docket entries. "DE" refers to the docket entries before this Court. "App." refers to the short appendix attached in support of this brief.

driving related offenses, punishable by a term exceeding a year. R. 33, p. 1.

On January 6, 2023, Mr. Rice moved to dismiss the indictment under the Second Amendment. *See generally* R. 28. Mr. Rice argued that § 922(g)(1) facially and as-applied violated the Second Amendment under *Bruen*. *See id.* at 1.

As to constitutional text, at *Bruen's* first prong, Mr. Rice argued that "possession of a firearm falls within the Second Amendment's plain text and protective ambit. As a result, Mr. Rice's conduct at issue – firearm possession, [was] presumptively constitutionally protected." *Id.* at 3. Mr. Rice further argued that he remained among "the People" the Second Amendment protected. *Id.* at 12-13. Last, at *Bruen's* second prong, Mr. Rice argued that his "prosecution for firearm possession, based on his criminal history contravenes the nation's firearm history and tradition." *Id.* at 13.

Regarding history, Mr. Rice argued that founding-era legislatures disarmed, but never for reasons related to all convictions, like Mr. Rice's conviction-based disarmament. "Rather, founding era and early republic [legislatures] targeted to disarm dangerous people or groups –those who

11

were a threat to engage in public violence, rebellion, insurrection, or posed a threat to the incipient and hard-fought independence and national sovereignty or were perceived to endanger domestic tranquility." R. 38, pp. 2-3. "What did not exist at the time of the founding was the criminalization of firearm possession by a person with no [criminal] history of [violence], such as Matthew Rice."[4] *Id.* at 3. Mr. Rice further argued that, with regards to criminal history, at the time of the Founding, Congress's authority to disarm was understood to apply to specific so-called dangerous or violent offenses, not all felony-level convictions. *See id.*

The government responded that Mr. Rice and persons convicted of a crime punishable by more than a year were not part of "the People" the Second Amendment's plain text protects. R. 33, pp. 7-10. The government additionally argued that felon firearm restrictions

---

[4] During the motion to dismiss, the government attempted to introduce information showing that Mr. Rice had been arrested in Indiana in January 2022, and February 2022. *See* R. 33, p. 2. Mr. Rice objected to the inclusion of this material because the incidents had not yet resulted in criminal convictions and went beyond the facts alleged in the indictment. *See* R. 38, pp. 3-4; *see also* Fed. R. Crim. P. 12. The District Court stated that "none of the additional facts are necessary to adjudicate this motion." R. 40, p. 2 n.1; *see also* App. p. 11 n.1. Accordingly, the District Court cabined its analysis to the facts raised in the indictment.

remained presumptively lawful under *Heller*. *See id.* at 4. Last, the
government argued that Mr. Rice's prosecution and § 922(g)(1)'s
restrictions were rooted in the nation's history and tradition. *See id.* at
10.

As to history, the government argued that "capital punishment
and forfeiture of estate" restrictions were sufficiently analogues to §
922(g)(1). *Id.* at 12-13. The government argued that "[w]ith a death
sentence, there was of course no need further to disarm a felon, and the
historical sentencing was far more serious than the permanent
disarmament of today's law[,]" and thus "tradition and history show[ed]
that 'those convicted of felonies are not among those entitled to possess
arms'" under the Second Amendment's plain text. *Id.* at 13-14 (quoting
*Medina v. Whitaker*, 913 F.3d 152, 158, 160 (D.C. Cir. 2019)).

Next, the government argued that § 922(g)(1) is analogous "to
disarmament laws that 'prohibited various categories of persons viewed
at the time as dangerous, having violent propensities, and/or unfaithful
to the sovereign and its laws' and those who refused 'to comply with
developing social and legal norms.'" *Id.* at 14 (quoting *United States v.
Rowson*, 652 F. Supp. 3d 436, 464 (S.D.N.Y. Jan. 26, 2023)). To that

point, the government added that the limits of the Second Amendment right as understood in 1791 included the "well-established" English practice of "disarm[ing] classes of people who, in the legislature's view, could not be depended upon to obey the rule of law." *Id.* at 14.

The government offered examples of such early disarming practices. The government argued that firearm regulations "directed toward disarming Native Americans and Black people were pervasive." *Id.* at 15. The government was clear that "[t]hese specific regulations of this period are repugnant (not to mention unconstitutional), but colonial history furnishes numerous examples in which full-fledged members of the political community as it then existed—i.e., free, Christian, white men—were disarmed due to conduct evincing inadequate faithfulness to the sovereign and its laws." (internal citation omitted). *Id.* at 16.

The government offered a 1630s Massachusetts act disarming the supporters "of an outspoken preacher" because of the group's "disavowal of the rule of law" and failure to demonstrate "obedience to the commands of the government." *Id.* (internal citation omitted). The government additionally referenced a Virgina act passed during the Seven Years War (1754-1763) "disarming Catholics who refused to take

a loyalty oath." *Id.* (internal citation omitted). The government

contended that the early Virgina act, "[l]ike the English law . . . , tied

disarmament to failure to take a loyalty oath—and exempted those who

took the oath after previously refusing." *Id.* (internal citation omitted).

The government next argued that on the eve of the Revolutionary

War, early colonial legislatures "passed numerous laws disarming non-

violent individuals because their actions evinced an unwillingness to

comply with the legal norms of the nascent social compact" specifically

"targeting those who failed to demonstrate loyalty to the emergent

American government." *Id.* at 16 (internal citations omitted). The

government offered a 1775 Connecticut act disarming any person

"convicted of libeling or defaming any acts or resolves of the Continental

Congress or the Connecticut General Assembly made for the [defense]

or security of the rights and privileges of the colonies." *Id.* at 17

(internal citation omitted).

The government argued that these regulations were proper

historical antecedents to § 922(g)(1) because the early legislatures

"made categorical judgments about disarmament that were not tied to

an individual's past violent acts but rather to the legislature's judgment

about who is included among the law-abiding, trustworthy members of the political community." *Id.*

The government next analogized to loyalty oaths required during the Revolutionary War. *See id.* The revolutionary loyalty oaths "strip[ped] anyone who failed or refused to take the oath of the right to bear arms." *Id.* (internal citations omitted). The government claimed that the revolutionary period demonstrated that "legislatures were understood to have the authority and broad discretion to decide when disobedience with the law was sufficiently grave to exclude even a non-violent offender from the people entitled to keep and bear arms." *Id.* at 19.

Post-bellum, when Congress ratified the Second Amendment, the government claims that "particularly persuasive evidence [showed] the founders understood that the constitutional right to bear arms is compatible with broad legislative authority to disarm groups legislatures did not trust to follow the law." *Id.* at 19 (internal citation omitted). The government offered a 1787 Pennsylvania Antifederalist proposal to create a constitutional amendment providing "no law shall be passed for disarming the people or any of them unless for crimes

committed, or real danger of public injury from individuals." *Id.*
(internal citation omitted). The government, additionally, cited a
Massachusetts proposal to include language that the "Constitution be
never construed to authorize Congress . . . to prevent the people of the
United States, who are peaceable citizens, from keeping their own
arms" and a New Hampshire proposal to include language that
"Congress shall never disarm any Citizen unless such as are or have
been in Actual Rebellion." *Id.* at 20 (internal citations omitted).
Congress did not adopt the Pennsylvania, Massachusetts, or New
Hampshire proposals into the Second Amendment's final text.

The District Court denied Mr. Rice's dismissal motion. *See* R. 40;
*see also* App pp. 10-31. First, as to Mr. Rice's as-applied challenge, the
District Court found that Mr. Rice's attack on § 922(g)(1) was foreclosed
by this Court's pre-*Bruen* Second Amendment precedent. R. 40, p. 6;
App. p. 15 (the District Court noting that *Bruen* "did not disturb
existing Seventh Circuit precedent which forecloses Mr. Rice's as-
applied challenge."); *see also* R. 40, p. 10; App. p. 19 ("This means the
Seventh Circuit's holding in *Kanter* [*v. Barr*] 919 F.3d 437 [442 (7th Cir.
2019)] upholding § 922(g)(1) as applied to non-violent felons remains

valid and binding precedent which precludes Mr. Rice's as-applied
challenge.").[5]

The District Court, alternatively, found that the government had
"carried its burden at the second prong of the *Bruen* test."[6] R. 40, p. 16;
App. p. 25. The District Court determined that the government had
carried its burden to show that historical laws "which authorized
capital punishment and estate forfeiture for persons convicted of
felonies" were "sufficiently analogous" to § 922(g)(1); the District Court
additionally found that it "does not need to analyze the second set of
historical regulations" showing 922(g)(1)'s connection to a "legislative

---

[5] In *Atkinson v. Garland*, 70 F.4th 1018, 1022 (7th Cir. 2023), this Court held that
*Kanter* and pre-*Bruen* case law could not be exclusively relied upon by a district
court confronted with a § 922(g)(1) challenge because *Kanter* applied the "means-
end inquiry after determining that the historical record on felons possessing
firearms was inconclusive." This Court remanded so the district court could
"conduct the historical analysis that *Bruen* now requires." *Id.*

[6] The District Court erroneously considered history at *Bruen's* first step, in
determining whether his conduct was protected by the Second Amendment's plain
text, but it ultimately assumed without deciding that Mr. Rice remained part of "the
People" the Second Amendment protects at *Bruen's* first prong. R. 40, p. 15; *see also*
App. p. 24. The District Court then proceeded to *Bruen's* second step, whether the
government carried its burden to show that Mr. Rice's prosecution was rooted in the
nation's history and tradition of firearm regulation. R. 40, pp. 15-16; App. pp. 24-25
(the District Court noting that even "if the previously discussed historical evidence
[at *Bruen's* first step] will not be used to define the scope of the Second Amendment
right, it is nonetheless useful for defining the scope of the legislature's power to take
that right away" at *Bruen's* second step.) (citing *United States v. Coombes*, 629 F.
Supp. 1149, 1158 (N.D. Okla. Sept. 21, 2022)).

judgment that the group could not be trusted to adhere to the rule of law." R. 40, p. 16; *see also* App. p. 25.

The District Court determined that "use of these severe punishments [capital punishment and estate forfeiture] on those convicted of violent and non-violent crimes shows that Mr. Rice's proposed distinction between violent and non-violent felonies is not supported by the historical record." R. 40, p. 17; *see also* App. p. 26. The District Court further noted that "given the exceptionally heavy burden these punishments place upon an individual, which inherently deprives the individual of their Second Amendment rights, disarmament under § 922(g)(1) is a comparatively lenient punishment and therefore is constitutionally permissible." R. 40, p. 18; App. p. 27.

The District Court found Mr. Rice's facial attack moot, because it had denied his as-applied challenge. *See* R. 40, p. 21; App. p. 30.

## V.    ARGUMENT SUMMARY

This Court has reviewed § 922(g)(1) in the *Bruen*, Second Amendment context. *See Atkinson,* 70 F.4th at 1024 (remanding for proper analysis of *Bruen's* text and history standard)*; see also United States v. Miles*, 86 F.4th 734, 740 (7th Cir. 2023) (denying the appellant-

defendant's Second Amendment challenge to § 922(g)(1), applying the plain error standard). The treatment of § 922(g)(1) under the *Bruen*, Second Amendment framework by sister circuits has varied.

The Third Circuit held § 922(g)(1) unconstitutional as-applied. *See Range*, 69 F.4th at 96, 100, 103. In *Range*, the Third Circuit found that the plain text of the Second Amendment applies to and protects all Americans, including those with a prior qualifying conviction. *See id.* at 100. And, the government's historical proffer of, among other things, felony capital punishment and estate forfeiture failed the *Bruen* historical standard. *See id.* at 105, 106.

The Eighth Circuit and the Tenth Circuit, by contrast, reached the opposite conclusion, finding that § 922(g)(1) as applied to convicted felons "consistent with the Nation's historical tradition of firearm regulation." *United States v. Jackson*, 69 F.4th 495, 502 (8th Cir. 2023); *see also Vincent v. Garland*, 80 F.4th 1197, 1202 (10th Cir. 2023) (finding § 922(g)(1) remained constitutional and that *Bruen's* test did not disturb pre-*Bruen* cases supporting long standing felon firearm prohibitions).

This Court should join the Third Circuit and adopt *Range's* holding and reasoning here that 1) Mr. Rice is part of the "the People" the Second Amendment protects; 2) firearm possession is conduct protected by the Second Amendment's plain text; 3) and the history and tradition of firearm regulation does not support Mr. Rice's disarmament. This Court should reverse the District Court's finding that Mr. Rice's prosecution under § 922(g)(1) does not offend the Second Amendment. Alternatively, it should remand for proper consideration of the history and tradition at *Bruen's* second prong, specifically, whether § 922(g)(1) addressed a long-standing social problem dating from 1791. *See Atkinson*, 70 F.4th at 1023.

Section 922(g)(1) is a categorical status prohibition. All persons convicted of a qualifying criminal offense, are prohibited from firearm possession and subject to criminal sanction for doing so. Currently, the statute imposes a fifteen-year maximum prison term. *See* 18 U.S.C. § 924(a)(8). In Mr. Rice's case, § 922(g)(1) applied because of his two Indiana driving related offenses.

The District Court erred in finding that the government had carried its historical burden at *Bruen's* second prong by analogizing to

early republic capital punishment for certain felony convictions and estate forfeiture. Neither are historical analogues to § 922(g)(1)'s application generally and in Mr. Rice's case specifically.

Indeed, the government offered historical analogues, but it did not address, nor did the District Court consider, whether "§ 922(g)(1) addresses a 'general societal problem that has persisted since the 18th century?' If this problem existed during a relevant historical period, did earlier generations address it with similar or 'materially different means?" *Atkinson*, 70 F.4th that 1023. The District Court did not engage the "proper inquiry, [this Court has explained], [which] should focus on how the *substance* of the historical examples compares to § 922(g)(1)." *Id.* at 1024. The substance of § 922(g)(1), applying to all felony convictions does not compare to 1791-orietented restrictions.

To be clear, under *Bruen*, § 922(g)(1) violates the Second Amendment as-applied to Mr. Rice, or indeed, anyone, regardless of their specific criminal history. The statute's scope and extent is not rooted in the nation's history and tradition of firearm regulation. As a result, the government has not been able to demonstrate that that founding-era history supports the permanent disarming and criminal

prosecution of those persons convicted of any offense punishable by a
prison term exceeding one year.

## VI.   STANDARD OF REVIEW

This Court has applied the *de novo* standard of review to a Second
Amendment challenge to a statute. *See United States v. Meza-
Rodriguez*, 798 F.3d 664, 668 (7th Cir. 2015).

Because Mr. Rice raised a constitutional challenge to § 922(g)(1)
before the District Court, his challenge is not subject to plain error
review. *See Miles*, 86 F.4th at 740. In addition, Mr. Rice may bring a
constitutional challenge on direct appeal without a conditional plea
under Rule 11 of the Federal Rules of Criminal Procedure. *See e.g.,
Class v. United States*, 583 U.S. 798, 806 (2018) (internal citations
omitted) (the Supreme Court permitting a direct-appeal challenging the
constitutionality of a statute after a guilty plea, and holding that
Federal Rule of Criminal Procedure 11(a)(2) does control the procedure
for raising a direct appeal challenging a statute's constitutionality);
*compare with Oliver v. United States*, 951 F.3d 841, 847 (7th Cir. 2020)
(this Court holding that *Class* does not apply when a defendant-

appellant waives a constitutional challenge to collaterally attack a statute through an express plea agreement waiver provision).

## VII. ARGUMENT

The Second Amendment of the United States Constitution reads: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." Like all constitutional rights, the Second Amendment right to keep and bear arms, however, is not unlimited. *See Atkinson*, 70 F.4th at 1020 (citing *Heller*, 554 U.S. at 626). Through *Bruen*, the Supreme Court articulated the text and history standard: "Accordingly, when the Second Amendment's 'plain text' covers the regulated conduct, the government has only one way to defend the regulation—by proving that it is 'consistent with this Nation's historical tradition of firearm regulation.'" *Id.* (quoting *Bruen*, 142 S. Ct. at 2126).

In *Bruen*, the Supreme Court stated when a firearm regulation is covered by the Second Amendment's plain text, the government may only "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." 142 S. Ct. at 2129-30. The government carries the burden of "affirmatively proving

that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127. Only then may a court conclude that the individual's conduct falls outside of the Second Amendment's ""unqualified command."' *Id.* at 2126 (citing *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)).

As to Second Amendment history, not all history is equal. "*Bruen* directs [a reviewing court to] canvass these historical periods for similar regulations." *Atkinson*, 70 F.4th at 1020. "When a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* at 1021 (internal citations omitted). "So too if the Founders used materially different means to address the same problem." *Id.* "And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality." *Id.*

In *Bruen*, the Supreme Court explained that constitutional rights "are enshrined with the scope they were understood to have when the people adopted them." 142 S. Ct. at 2136. Accordingly, the Supreme Court has "generally assumed" that the scope of the Second Amendment right is pegged to the historical tradition "when the Bill of Rights was adopted in 1791." *Id.* at 2137.

Courts may also look to historical precedent "before" and "even after the founding," but they should do so with caution. *Id.* at 2131-32. For example, "[h]istorical evidence that long predates" the Founding "may not illuminate the scope of the [Second Amendment] right if linguistic or legal conventions changed in the intervening years." *Id.* at 2136. Similarly, a reviewing court "must be careful when assessing evidence concerning English common-law rights." *Id.* In addition, a reviewing court "must also guard against giving postenactment history more weight than it can rightly bear." *Id.* "Thus, post-ratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Id.* (internal citations omitted)."Therefore, whether modern and historical regulations impose a comparable burden on the right of

armed self-defense and whether that burden is comparably justified are central considerations when engaging in an analogical inquiry" under the Second Amendment. *Id.* at 2133.

## A. Congress passed § 922(g)(1) to keep firearms out of the hands of the public generally.

It is worth briefly considering § 922(g)(1)'s origins. "Before the New Deal Revolution, Congress was powerless to regulate gun possession and use." *Range*, 69 F.4th at 108 (Porter, J., concurring) (citing *United States v. Cruikshank*, 92 U.S. 542, 55 (1875); *Presser v. Illinois*, 116 U.S. 252, 265 (1886)). In 1938, the New Deal transformative shift entered the Second Amendment context when Congress passed a precursor to § 922(g)(1). It was in that statute that Congress created "the first federal [law] disqualifying felons from possessing firearms . . . ." *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010). At that time, the statute "covered only a few violent offenses," *id.,* such as prohibiting firearm possession by those convicted of crimes such as murder, rape, kidnapping, and burglary. *See id.* "Indeed, the current federal felony firearm ban differs considerably from the version of the proscription in force just half a century ago." *Id.* Thus, to the extent Congress had initially disarmed, it did so based on

27

criminal conviction severity, rather than applying broadly to any felony conviction. For example, the instant statute as originally constructed would not have imputed criminal liability on Mr. Rice's firearm possession as a non-violent felon. *See Range*, 69 F. 4th at 104.

It was not until 1961, that Congress amended the statute to prohibit "possession by all felons." *Skoien,* 614 F.3d at 640. Seven years later, "Congress changed the 'receipt' element of the 1938 law to 'possession,' giving [§ 922(g)(1)] its current form." *Id*. Thus § 922(g)(1) was passed a century and a half after adoption of the Second Amendment. And, for the first time, prohibited felons' possession without conviction distinction.

Congress's purpose in "enact[ing] the [assorted] exclusions in [18 U.S.C.] § 922(g) [may have been] to keep guns out of the hands of presumptively risky people" but the prohibitions applied maximally to reduce the availability of firearms nationally. *United States v. Yancey*, 621 F.3d 681, 683 (7th Cir. 2010). Indeed, when Congress enacted the various prohibitions under § 922(g), it was concerned with the "widespread traffic in firearms and with their general availability to those whose possession thereof was contrary to the public interest."

28

*Huddleston v. United States,* 415 U.S. 816, 824 (1974). "Congress determined that the ease with which firearms could be obtained contributed significantly to the prevalence of lawlessness and violent crime in the United States." *Id.* The 1968 and current version of the statute was "thus aimed at restricting *public* access to firearms." *Id.* (emphasis added). It is with that broad, public restriction in mind that the statute was applied to Mr. Rice. To keep firearms from being widely, publicly, available, Congress, in 1968, drastically expanded federal firearms status enforcements beyond any founding-era notions.

**B. Mr. Rice's conduct of possession of a firearm falls within the Second Amendment's plain text.**

The Second Amendment protects the right to keep and bear arms, and would, certainly, apply to Mr. Rice's  conduct of possession of a firearm. *See Heller*, 554 U.S. at 582 "([T]he Second Amendment extends prima facie, to all instruments that constitute bearable arms . . . .'). Accordingly, Mr. Rice's conduct of firearm possession is protected by the Second Amendment. *See Range*, 69 F.4th at 103 (finding the "easy" question of whether 922(g)(1)'s regulated conduct falls within the Second Amendment's plain text.); *United States v. Rahimi*, 61 F.4th 443, 454 (5th Cir. 2023) (finding 18 U.S.C. § 922(g)(8) (prohibited

firearm possession by those subject to a domestic restraining order)
unconstitutional) (noting that "Rahimi's possession of a pistol and a
rifle easily falls within the purview of the Second Amendment.").

Numerous district courts have reached the same conclusion,
finding that firearm possession is Second Amendment protected at
*Bruen's* first prong. *See United States v. Forbis*, --- F. Supp. 3d ---, 2023
WL 5971142, *3 (N.D. Okla. Aug. 17, 2023) (finding § 922(g)(1)
unconstitutional as-applied, and concluding the conduct of firearm
possession is constitutionally protected at *Bruen's* first step); *United
States v. Bullock*, --- F. Supp. 3d ---, 2023 WL 4232309, at *19-20 (S.D.
Miss. June 28, 2023) (same); *United States v. Quailes*, --- F. Supp. 3d ---,
2023 WL 5401733, *8 (E.D. Pa. Oct. 21, 2023) (same); *United States v.
Harper*, No. 1:21-CR-0236, 2023 WL 5672311, at *6 (E.D. Pa. Sept. 1,
2023) (same), (noting *Range's* finding that the Second Amendment
applied to a request to possess a firearm); *United States v. Prince*, No.
22 CR 240, 2023 WL 7220127, *4-5 (N.D. Ill. Nov. 2, 2023) (finding §
922(g)(1) facially unconstitutional and concluding that possession of a
firearm by a felon is Second Amendment protected at *Bruen's* first
prong); *United States v. Griffin*, Case No. 21-cr-00693, 2023 WL

8281563, *4 (N.D. Ill. Nov. 30, 2023) (finding that firearm possession and restricting firearm possession protected by the Second Amendment's plain text at *Bruen's* first prong); *United States v. Salme-Negrete*, Case No. 1:22-cr-00637, 2023 WL 7325888, *5 (N.D. Ill. Nov. 7, 2023) (finding § 922(g)(1) unconstitutional as-applied, and finding the Second Amendment protects the act of firearm possession); *United States v. Diaz*, Case No. 1:20-cr-00597, 2023 WL 8019691, *5 (N.D. Ill. Nov. 20, 2023) (same); *United States v. Leblanc*, --- F. Supp.3d ----, 2023 WL 8756694, at *5 (M.D. La. Dec. 19, 2023) (finding § 922(g)(1) unconstitutional as-applied and that the Second Amendment's plain text regulated the possession prohibition).

Indeed, the conduct prohibited by § 922(g)(1), firearm possession for any purpose including in the home or on the person for defensive purposes, falls within the central protection of the Second Amendment. *See Bruen*, S. Ct. at 2133. Considering the extent to which § 922(g)(1) burdens and restrains the right to self-defense, the statute falls within the Second Amendment. *See Quailes*, WL 5401733, *1 (the district court holding that § 922(g)(1) violates the Second Amendment as applied to a defendant with four recent drug trafficking convictions, and rejecting

31

the government's argument that the defendant must demonstrate that his possession was related to self-defense in the first instance).

The government may rely on language in *Heller*, that felon disarming laws are "presumptively lawful," *see* 554 U.S. at 627 n.26, and Justice Kavanaugh's *Bruen* concurrence's endorsement of that language. 142 S. Ct. at 2162. However, the question of conviction disarmament laws' constitutionality was not presented in *Heller*. Indeed, this Court has not treated *Heller's* "presumptively lawful" language as foreclosing § 922(g)(1) review. *See e.g.*, *Skoien*, 614 F.3d at 640 (this Court reasoning that a reviewing court should "not . . . treat *Heller* as containing broader holdings than the Court set out to establish . . . . What other entitlements the Second Amendment creates, and what regulations legislatures may establish, were left open."). Further, in *Heller*, the Supreme Court described felon-disarmament laws as "longstanding," 554 U.S. at 626, however it "never actually addressed the historical pedigree" of those laws." *Kanter*, 919 F.3d at 445. The Supreme Court, in other words, did not even claim it had surveyed the relevant history and discovered a (robust but undisclosed) tradition of felon-disarmament laws dating back to the founding-era.

Rather, it simply asserted such laws were longstanding, and therefore presumptively lawful. In fact, felon-disarmament laws are not longstanding—at least not in the sense that *Bruen* would use that term as demonstrating an unbroken historical chain animating from the Founding. As stated above, Congress did not pass the federal statute at issue here until 1938, and it was not until the 1960s that Congress amended the statute to cover a defendant such as Mr. Rice and his concomitant criminal history. Accordingly, the government will not be able to rely on *Heller's* "presumptively lawful" language.

## C.  Mr. Rice remains part of "the People" the Second Amendment protects.

The government, including before the District Court here, has argued that Supreme Court precedent establishes that felons, such as Mr. Rice, are not among "the People" the Second Amendment protects. That position cannot be squared with the Supreme Court's and this Court's prior precedent.

In *Heller*, the Supreme Court described the term "the people" to "refer[ ] to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." 554 U.S. at 580 (citing *United*

*States v. Verdugo–Urquidez*, 494 U.S. 259, 265 (1990)). In *Heller*, the

Supreme Court began with a "strong presumption that the Second

Amendment right is exercised individually and belongs to *all*

*Americans*." *Id.* at 581 (emphasis added); *see also Rahmi*, 614 F. 4th at

451 (the Fifth Circuit reasoning that "*Heller's* exposition of 'the people'

strongly indicates that Rahimi is included in 'the people' and thus

within the Second Amendment's scope" notwithstanding his pending

domestic protective order).

    In fact, "*Heller* and *Bruen* did not *hold* that the Second

Amendment categorically protects only law-abiding citizens . . . .

[the] *Heller* Court explained that 'the [P]eople' as used throughout the

Constitution 'unambiguously refers to all members of the political

community, not an unspecified subset.'" *Diaz*, 2023 WL 8019691, *5

(quoting *Heller*, 554 U.S. at 580) (emphasis in original). This Court, in

addition, has not broadly found felons to be categorically excluded from

Second Amendment protection. *See e.g.*, *Meza-Rodriguez*, 798, F.3d at

669 (internal citations omitted) (this Court noted that [w]hile some of

*Heller's* language does link Second Amendment rights with the notions

of law-abiding citizens and members of the political community, those

passages did not reflect an attempt to define the term people."); *see also Skoien*, 614 F.3d at 648.

Moreover, finding that the term "the People" is different in the Second Amendment context than elsewhere in the Bill of Rights would contravene the Supreme Court's command that the Second Amendment is coextensive with other Bill of Rights protections. *See Bruen*, 142 S. Ct. at 2156 (the Supreme Court noting that the "constitutional right to bear arms in public for self-defense is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'") (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010)); *see also Range*, 69 F.4th at 102 (the Third Circuit reasoning that "[u]nless the meaning of the phrase 'the people' varies from provision to provision—and the Supreme Court in *Heller* suggested it does not—to conclude that Range is not among 'the people' for Second Amendment purposes would exclude him from those rights as well. And we see no reason to adopt an inconsistent reading . . . ." (internal citation omitted); *see also United States v. Daniels*, 77 F.4th 337, 342 (5th Cir. 2023) (the Fifth Circuit finding 18 U.S.C. § 922(g)(3) (prohibited firearm possession by a controlled substance user)

unconstitutional as-applied under *Bruen* and analogizing the Second Amendment to other Bill of Rights provisions and by  noting: "[T]he Bill of Rights uses the phrase 'the people' five times. In each place, it refers to all members of our political community, not a special group of upright citizens . . . even as a marihuana user, Daniels is a member of our political community. Therefore, he has a presumptive right to bear arms.").

The government may argue that the term 'the People' is supported by citation to 'law abiding" and 'responsible persons.' But, grounding constitutional protections with concepts such as "law abiding" or "responsible citizen" would create an unworkable standard. *See Range*, 69 F.4th at 102 (the Third Circuit reasoning that "the phrase law-abiding, responsible citizens is as expansive as it is vague. Who are law-abiding" citizens in this context? Does it exclude those who have committed summary offenses or petty misdemeanors, which typically result in a ticket and a small fine? No."); *see also id.* at 102-03 ("[a]t root, the Government's claim that only law-abiding, responsible citizens are protected by the Second Amendment devolves authority to legislators to decide whom to exclude from "the people." We reject that approach

because such extreme deference gives legislatures unreviewable power to manipulate the Second Amendment by choosing a label."); *see also Bullock*, 2023 WL 4232309, *21 (internal citation omitted) (reasoning that the defendant despite his crime of violence and drug distribution offenses remained part of "the People" the Second Amendment protected because "our Republic of over 330 million people, Americans have widely divergent ideas about what is required for one to be considered a responsible citizen" and concluding that a law abiding and responsible citizen standard unworkable."). Mr. Rice, too, remains among "the People" the Second Amendment protects. To conclude he is not, based on a determination he is not law abiding or responsible would give Congress the very means-end balancing and decision-making authority *Bruen* vitiated.

## D. The government cannot affirmatively show that Mr. Rice's disarming is rooted in the nation's founding-era history and traditions.

If the conduct at issue falls within the Second Amendment's plain text, the conduct is presumed constitutionally protected. *See Bruen*, 142 S. Ct. at 2126. To rebut the presumption of unconstitutionality, *Bruen* held, "the government may not simply posit that [a] regulation

promotes an important interest." *Id.* "Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* If the government cannot do so, the challenged statute violates the Second Amendment. *See id.* if there are "multiple plausible interpretations" of a piece of historical evidence, courts should "favor the one that is more consistent with the Second Amendment's command." *Id.* at 2141 n.11. In other words, where "history [is] ambiguous at best," the challenged statute is unconstitutional. *Id.* at 2139.

The government must also proffer history that is both "well-established" and "representative." *Id.* at 2133. A few statutes or cases from a small number of "outlier jurisdictions" do not constitute a historical tradition. *Id.* at 2153, 2156. *Bruen* expressed "doubt," for instance, that "three colonial regulations" would be sufficient to satisfy the government's burden. *Id.* at 2142. Moreover, even if certain statutes were widespread, courts should not consider them determinative unless the historical record reveals the statutes were actually "enforced." *Id.* at 2149.

The operative question, therefore, is whether the "modern and historical regulations are relevantly similar, including in terms of how and why the regulations burden gun rights." *Atkinson*, 70 F.4th at 1024.

### 1. The District Court erred in finding that the government proffered sufficient historical evidence that § 922(g)(1)'s application to Mr. Rice was consistent with the national historical tradition of firearm regulation.

The District Court concluded that the government had satisfied its affirmative historical burden based on analogizing capital punishment and estate forfeiture to § 922(g)(1). *See* App. p. 27 (discussing disarmament under § 922(g)(1) as lenient). In *Range*, the Third Circuit held neither functioned as a proper or sufficient historical analogue. 69 F.4th at 103.

As to capital punishment, *Range* noted that notwithstanding "[f]ounding-era governments punished some nonviolent crimes with death does not suggest that the particular (and distinct) punishment at issue—lifetime disarmament—is rooted in our Nation's history and tradition." *Id.* Indeed, *Range* stated that "[t]he greater does not necessarily include the lesser: founding-era governments' execution of some individuals convicted of certain offenses does not mean the State, then or now, could constitutionally [permanently] strip a felon of his

39

right to possess arms if he was not executed."). Capital punishment fails

as a regulatory analogue, as noted in *Range*, because the deprivation

would flow from the punishment itself, not the status of conviction. *See*

*id.* at 105; *see also Prince*, 2023 WL 7220127, *10 (reasoning that

firearm "dispossession" under § 922(g)(1) functions as a "consequence"

of the conviction, "rather than punishment."). And, the practice of

punishing some felony offenses with death does not suggest that there

is a historical practice of permanently disarming all felony-level

convictions. *See e.g.*, *Prince*, 2023 WL 7220127, *10 (reasoning that

"historical regulations that tied an individual's felony conviction to

severe consequences (capital punishment and estate forfeiture) imposed

punishment for the individual's crime, making them distinct from §

922(g)(1).").

The government's reliance on estate forfeiture laws additionally

fail. To begin, the English doctrine of felony estate forfeiture never "took

hold in the United States." *Austin v. United States*, 509 U.S. 602, 613

(1993). And although "[f]ounding-era laws often prescribed the

forfeiture of the weapon used to commit a firearms-related offense,"

such laws did not "affect[] the perpetrator's right to keep and bear arms

generally." *Range*, 69 F.4th at 105. As noted in *Range*, the "government

confiscation of the instruments of crime (or a convicted criminal's entire

estate) differs from a status-based lifetime ban on firearm possession."

*Id.* Furthermore, as noted in *Range*, estate forfeiture did not preclude

the convicted person from reacquiring his property, including his

firearm, after his sentence had been completed, and societal debt paid.

*See id.* Unlike § 922(g)(1), estate forfeiture did not function as a

permanent status restriction or loss of possessory rights. *See Prince*,

2023 WL 7220127, *10 (internal citation omitted) (the district court

reasoning that though it "agrees with the D.C. Circuit in *Medina* that

capital punishment and estate forfeiture laws imposed severe

consequences on certain felons, it also agrees with the Third Circuit in

*Range* that these consequences do not suggest that the particular (and

distinct) punishment at issue—lifetime disarmament—is rooted in our

Nation's history and tradition.").

### a.) Colonial and early state laws.

Though the District Court in this case did not rely on colonial and

early state provisions, it is worth noting here why those provisions fail.

"[A]t no time between 1607 and 1815 did the colonial or state governments of what would become the first fourteen states exercise a police power to restrict the ownership of guns by members of the body politic." Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 142, 143 & n.11 (2007). Similarly, "state laws prohibiting felons from possessing firearms or denying firearms licenses to felons date from the early part of the twentieth century" not the Founding. Carlton F.W. Larson, *Four Exceptions in Search of A Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1376 (2009). "[O]ne can with a good degree of confidence say that bans on convicts possessing firearms were unknown before World War I." C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J. L. & Pub. Pol'y 695, 708 (2009); *see also* Franklin E. Zimring, *Firearms and Federal Law: The Gun Control Act of 1968*, 4 Journal of Legal Studies 133, 135 (1975); *see also* Adam Winkler, *Heller's Catch-22*, 56 UCLA L. Rev. 1551, 1563 (2009) ("[b]ans on ex-felons possessing firearms were first adopted in the 1920s and 1930s, almost a century and a half after the

Founding."); *see also* Nelson Lund, *The Second Amendment, Heller, and Originalist Jurisprudence*, 56 UCLA L. Rev. 1343, 1357 (2009) (noting "the absence of historical support for the claim that [felon-disarmament laws] are consistent with the preexisting right to arms"); Lawrence Rosenthal, *The Limits of Second Amendment Originalism and the Constitutional Case for Gun Control*, 92 Wash. U. L. Rev. 1187, 1211 (2015) ("prohibitions on the possession of firearms by convicted felons emerged early in the twentieth century in response to a crime wave following the First World War.").

In short, there was no "historical tradition," circa 1791, of gun regulations similar to § 922(g)(1). *Bruen*, 142 S. Ct. at 2130-31. The "Founders themselves could have adopted" laws like § 922(g)(1) to "confront" the "perceived societal problem" posed by felons, or as is the case here, a non-violent felon. *Id.* at 2131. Nonetheless, they declined to do so, and that inaction indicates § 922(g)(1) "[i]s unconstitutional." *Id.* In addition, based on the facts presented here, the Founding generation's lack of a firearm restriction or criminalization of firearm possession by a non-violent felon, or to all felons, shows that 922(g)(1)'s

application here violates Mr. Rice's Second Amendment rights as § 922(g)(1) is not rooted in founding-era history.

To that end, though not dispositive before the District Court, the government cannot resort to state ratifying conventions. R. 33, pp. 18-20. The government offered three ratifying provisions, but those suggestions were not added into the Second Amendment text. To the extent those ratifying conventions would have included a similar restriction to § 922(g)(1) in the Second Amendment text, that the language was considered and rejected is probative of 922(g)(1) unconstitutionality. *See e.g.*, *Bruen*, 142 S. Ct. at 2131 (the Supreme Court reasoning that if a jurisdiction "actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality."). In addition, the government's reference of considered, but not adopted proposals, runs head long into the how this Court has instructed a lower court to weigh historical evidence and which sources of historical evidence are most probative. *See Atkinson*, 70 F.4th at 1021.

Further, as an analogy, the potential danger posed by felons'
access to firearms would have been neither unprecedented nor
unimaginable to the Founders. Nor would the regulation of firearm
possession based on felony-severity be unimaginable at the time of the
Founding. That the Founding generation did not criminalize firearm
possession for non-violent felony offenders shows that Mr. Rice's
prosecution is inconsistent with the national history and tradition of
firearm regulation. The societal concern regarding criminality surely
existed in 1791, that the founding-era treated the issue materially
differently and with greater Second Amendment circumscription shows
§ 922(g)(1) is not rooted in founding-era history.

Rather, "[t]he historical evidence does, however, support a
different proposition: That founding-era legislatures disarmed those
who had *demonstrated a proclivity for violence or whose possession of
guns would otherwise threaten the public safety*." *Kanter*, 919 F.3d at
454 (Barrett, J., dissenting) (emphases added). At best, the founding-
era felony history is inclusive, which favors Mr. Rice's challenge. *See
e.g., United States v. Chester*, 628 F.3d 673, 679 (4th Cir. 2010) (stating
that "[f]ederal felon dispossession laws . . . were not on the books until

the twentieth century, and the historical evidence and scholarly writing on whether felons were protected [or not] by the Second Amendment at the time of its ratification is inconclusive").

Mr. Rice's criminal history evinces no proclivity for violence. If the how and why, or purpose, of early firearm regulation was to disarm violent members of the community to preserve community harmony and safety, § 922(g)(1), goes far beyond that historical tradition. See *Kanter*, 919 F.3d at 454. In 1791, there was no "well-established" or representative practice of barring all felons from possessing firearms. Accordingly, Mr. Rice's disarmament and prosecution violates the Second Amendment. *Bruen*, 142 S. Ct. at 2133.

### b.) Loyalty laws.

In addition, as stated above, though the District Court here found that the government had carried its *Bruen* historical burden, through capital punishment and estate and forfeiture laws, it is worth mentioning that the government's proffer of colonial and Revolutionary War loyalty laws would also fail. *See* R. 33, p. 16.

In *Range*, the Third Circuit rejected such history, as many such restrictions were grounded in religious expression, race, or tribal

affiliation, and consequently, would be unconstitutional today. 69 F.4th at 104-05. Furthermore, in *Range*, the Court stated that those kinds of restrictions, were not analogous to § 922(g)(1) or Mr. Rice's disarmament because those restrictions were based on founding-era "distrust" and the practice of "disarming groups" early legislatures disfavored. *Id.* at 105. Those limited examples of "Founding-era governments disarm[ing] groups they distrusted like Loyalists . . . does nothing to prove that [Mr. Rice]" is or would be "part of a similar group today." *Id.* Therefore, "any such analogy would be far too broad" *Id.* (internal quotation marks omitted). Specifically, those analogies fail as they would not algin with the how and why legislatures disarmed non-loyalists during the Revolutionary War period, charged with protection of the nascent state, compared with the how and why Congress disarmed under § 922(g)(1), to reduce the availability of firearms generally. *See id.*

## 2. The District Court failed to apply the historical evidence consistent with *Atkinson*.

As to the types of evidence, this Court in *Atkinson* cautioned that the government carries a legitimate, substantial historical burden under *Bruen* and the Court must hold the government to that burden.

70 F.4th at 1022. The proper historical inquiry is thus whether the substance of the historical examples evinces a comparable pattern of firearm limitation as the challenged restriction. *See id.* at 1024. To the extent possible, a reviewing court should consider any details regarding the "history of enforcement, impact, or judicial scrutiny of these [proffered] laws . . . ." *Id.*

Here, the government attempted to satisfy its burden by analogizing to capital punishment (an approach rejected in *Range*) and estate forfeiture. But the government offered little actual evidence as to how those comparisons were putatively similar to § 922(g)(1), or more critically how those comparisons measured against Mr. Rice's criminal history as a basis for permanent disarmament. That will not do under *Atkinson,* where the proffered history must offer sufficient detail including judicial treatment, as to the historical nexus between the regulation today and the historical tradition. Simply listing analogues is not adequate. *See Atkinson*, F.4th at 1024 ("The parties should not stop at compiling lists of historical firearms regulations and practices.").

Furthermore, the government proffered history principally through law review citations without an analysis or explanation of

whether § 922(g)(1) or Mr. Rice's criminal disarmament was based "on a general societal problem that has persisted since the 18th century" or whether it may proceed by analogy because the issue presented was unprecedented at the time of the founding. *Id.* at 1023. The government here made no effort to distinguish the two, and the District Court failed to apply the proper historical methodology.

Furthermore, the District Court did not address, and consequently resolve, the question of whether either § 922(g)(1) or Mr. Rice's conduct addressed an 18th century general societal concern, and if so, whether the concern was addressed through materially different means. In *Atkinson*, the Court stated that this issue needed to be resolved in the first instance at *Bruen's* second step. *See e.g.*, *id.* (internal citations omitted) (directing the district court to consider the question of does "§ 922(g)(1) address a general societal problem that has persisted since the 18th century? If this problem existed during a relevant historical period, did earlier generations address it with similar or 'materially different means?").

This is not to suggest that the government may never meet its *Bruen* burden or that its burden is insuperable. The above, rather, is

offered to show that its effort in Mr. Rice's case was inconsistent with *Bruen* and *Atkinson* and falls short of what this Court now requires as historical evidence to justify deprivation of the exercise of protected Second Amendment interests. Mr. Rice asks this Court to remand for proper consideration of *Bruen's* second prong applying the appropriate methodology and evidentiary scrutiny.

## VIII. CONCLUSION

For the foregoing reasons, Mr. Rice asks this Court to reverse the District Court's denial of his motion to dismiss. This Court should reverse the District Court's ruling that § 922(g)(1) facially and as applied did not violate the Second Amendment.

Alternatively, Mr. Rice asks this Court to remand for proper consideration of the remaining portion of the *Bruen* test --- whether § 922(g)(1) is consistent with the nation's history and tradition of firearm regulation.

## IX.    STATEMENT CONCERNING ORAL ARGUMENT

Pursuant to Rule 34(a) of the Federal Rules of Appellate Procedure and Circuit Rule 34(f), Mr. Rice requests oral argument. Given the recency of the *Bruen* framework, and the limited case law

addressing § 922(g)(1)'s constitutionality, Mr. Rice submits that oral

argument will assist this Court's review of the District Court's denial of

his motion to dismiss.

Date:  <u>December 21, 2023</u>

                                        Respectfully submitted,

                                        Northern District of Indiana
                                        Federal Community Defenders, Inc.

                                        By:   <u>s/Chad J. Pennington</u>
                                              200 E. Main Street, Suite 905
                                              Fort Wayne, IN  46802
                                              Phone: (260) 422-9940
                                              Fax: (260) 422-9954
                                              E-mail: Chad_Pennington@fd.org

**CERTIFICATE OF COMPLIANCE WITH FRAP RULE 32(a)(7)(C)**

The undersigned certifies that this brief complies with the volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(C) and Circuit Rule 32 in that it contains 10,091 words as shown by Microsoft Word for Microsoft 365 used in preparing this brief.

Date:  December 21, 2023

<div style="margin-left:40%">

s /Chad J. Pennington
Chad J. Pennington, Attorney for
Defendant-Appellant Mattew Rice

</div>

## CERTIFICATE OF SERVICE

I hereby certify that on <u>December 21, 2023</u>, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

<u>s /Chad J. Pennington</u>
Chad J. Pennington, Attorney for
Defendant-Appellant Matthew Rice

No. 23-2891

# UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

**UNITED STATES OF AMERICA,**
        **Plaintiff-Appellee,**

        **v.**

**MATTHEW RICE**
        **Defendant-Appellant**

Appeal from the United States District Court
for the Northern District of Indiana
Case No.  3:22-CR-36
The Honorable Judge Jon E. DeGuilio

## ATTACHED REQUIRED SHORT APPENDIX
## OF DEFENDANT-APPELLANT MATTHEW RICE

Northern District of Indiana Federal
Community Defenders, Inc.
Chad J. Pennington
Attorney for Defendant-Appellant
Matthew Rice
200 E. Main Street, Suite 905
Fort Wayne, IN 46802
Telephone: (260) 422-9940
Fax: (260) 422-9954
Email: Chad_Pennington@fd.org

## TABLE OF CONTENTS FOR APPENDIX

1.  Certificate of Compliance with Circuit Rule 30 ........................................App. 1

2.  *Indictment* [DE 10] entered May 11, 2022, in the United States District
    Court for the Northern District of Indiana, South Bend Division in
    Case No. 3:22-CR-36 ............................................................................App. 2

3.  *Judgment in a Criminal Case* [DE 64] entered September 21, 2023, in
    the United States District Court for the Northern District of Indiana,
    South Bend Division in Case No. 3:22-CR-36 ............................................App. 4

4.  *Opinion and Order* [DE 40] entered March 17, 2023, in the United
    States District Court for the Northern District of Indiana, South Bend
    Division in Case No. 3:22-CR-36 ...........................................................App. 10

**CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30**

The undersigned counsel hereby states that all of the materials

required by Circuit Rule 30(a) and 30(b) are included in the Appendix.

Date:  <u>December 21, 2023</u>

<div align="right">

<u>s /Chad J. Pennington</u>
Chad J. Pennington, Attorney for
Defendant-Appellant Matthew Rice

</div>

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| UNITED STATES OF AMERICA | ) | **INDICTMENT** |
| | ) | |
| | ) | |
| v. | ) | Case No. 3:22CR36 |
| | ) | |
| | ) | |
| MATTHEW RICE | ) | 18 U.S.C. § 922(g)(1) |

**THE GRAND JURY CHARGES**:

On or about April 11, 2022, in the Northern District of Indiana,

**MATTHEW RICE,**

defendant herein, knowing that he had been convicted of a crime punishable

by imprisonment for a term exceeding one year, did knowingly possess a

firearm in and affecting commerce.

All in violation of Title 18, United States Code, Section 922(g)(1).

App. 2

## FORFEITURE ALLEGATION

1.     The allegations contained in the Indictment are hereby realleged and by this reference fully incorporated herein for the purpose of alleging forfeiture to the United States of America pursuant to the provisions of Title 18, United States Code, Section 924(d), and Title 28, United States Code, Section 2461(c).

2.     Upon conviction of an offense in violation of Title 18, United States Code, Section 922(g)(1) as alleged in the Indictment, the defendant, **MATTHEW RICE**, shall forfeit to the United States of America pursuant to Title 18, United States Code, Section 924(d), and Title 28, United States Code, Section 2461(c), any and all firearms, firearm magazines or clips, and ammunition involved in the commission of the offense.

Dated: May 11, 2022

<div align="center">A TRUE BILL:</div>

s/ Foreperson
Grand Jury Foreperson

APPROVED BY:

CLIFFORD JOHNSON
UNITED STATES ATTORNEY

By:     s/Frank E. Schaffer
Frank E. Schaffer
Assistant United States Attorney

<div align="center">2</div>

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA

**UNITED STATES OF AMERICA**

             **Plaintiff,**

    **vs.**

**MATTHEW RICE**

             **Defendant.**

**CASE NUMBER: 3:22CR036-001**

**USM Number: 98364-509**

**SCOTT J FRANKEL - FCD
DEFENDANT'S ATTORNEY**

### JUDGMENT IN A CRIMINAL CASE

**THE DEFENDANT** pleaded guilty to count 1 of the Indictment on May 3, 2023.

**ACCORDINGLY,** the court has adjudicated that the defendant is guilty of the following offense:

| Title, Section & Nature of Offense | Date Offense Ended | Count Number |
|---|---|---|
| 18:922(g)(1) FELON IN POSSESSION OF A FIREARM AND FORFEITURE ALLEGATION | April 11, 2022 | 1 |

The defendant is sentenced as provided in pages 2 through 6 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

Final order of forfeiture filed on August 1, 2023.

**IT IS ORDERED** that the defendant must notify the United States Attorney for this district within 30 days of any change of name, residence, mailing address or other material change in the defendant's economic circumstances until all fines, restitution, costs and special assessments imposed by this judgment are fully paid.

September 21, 2023
_____
Date of Imposition of Judgment

s/ Jon E. DeGuilio
_____
Signature of Judge

Jon E. DeGuilio, United States District Judge
_____
Name and Title of Judge

September 21, 2023
_____
Date

App. 4

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of **TIME SERVED.**

## RETURN

I have executed this judgment as follows:

        Defendant delivered _____ to _____ at _____, with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By: _____
DEPUTY UNITED STATES MARSHAL

App. 5

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of **2 years.**

## CONDITIONS OF SUPERVISION

While on supervision, the defendant shall comply with the following conditions:

1.  You must not commit another federal, state, or local crime.

2.  You must not unlawfully possess a controlled substance.

3.  You must not unlawfully use any controlled substance, including marijuana, and must submit to one drug test within 15 days of the beginning of supervision and at least 2 periodic tests after that for use of a controlled substance.

4.  You must cooperate with the probation officer with respect to the collection of DNA.

5.  You must be lawfully employed full-time (at least 30 hours per week). If you are not employed full-time, you must try to find full-time employment under the supervision of the probation officer. If you become unemployed, or change your employer, position, or location of employment, you must tell the probation officer within 72 hours of the change. If after 90 days you do not find employment, you must complete at least 10 hours of community service per week until employed or participate in a job skills training program approved and directed by your probation officer.

6.  You must report in person to the probation office, in the district which you are released, within 72 hours of release from the custody of the Bureau of Prisons. You must report to the probation officer in the manner and as frequently as the court or the probation officer directs; and you must notify the probation officer within 48 hours of any change in residence, and within 72 hours of being arrested or questioned by a police officer.

7.  You must not travel knowingly outside the federal judicial district without the permission of the court. Alternatively, the probation officer will grant such permission when doing so will reasonably assure the probation officer's knowledge of your whereabouts and that travel will not hinder your rehabilitation or present a public safety risk.

8.  You must truthfully answer any inquiry by the probation officer and must follow the instruction of the probation officer pertaining to your supervision and conditions of supervision. This condition does not prevent you from invoking the Fifth Amendment privilege against self-incrimination.

9.  You must permit a probation officer to meet at your home or any other reasonable location and must permit confiscation of any contraband the probation officer observes in plain view. The probation officer will not conduct such a visit between the hours of 11:00 p.m. and 7:00 a.m. without specific reason to believe a visit during those hours would reveal information or contraband that wouldn't be revealed through a visit during regular hours.

USDC IN/ND case 3:22-cr-00036-JD-MGG document 164 filed 09/21/23 page 4 of 6
Case Number: 3:22CR036-001
Defendant: MATTHEW RICE

Page 4 of 6

10.     You must not meet, communicate, or otherwise interact with persons whom you know to be engaged or planning to be engaged in criminal activity.

11.     You must not possess a firearm, ammunition, destructive device, or any other dangerous weapon (meaning an instrument designed to be used as a weapon and capable of causing death or serious bodily harm).

12.     You must not enter into any agreement to act as an informant or special agent of a law enforcement agency without the court's permission.

## CRIMINAL MONETARY PENALTIES

The defendant shall pay the following total criminal monetary penalties in accordance with the schedule of payments set forth in this judgment.

| Total Assessment | Total Fine | Total Restitution |
|:---:|:---:|:---:|
| $100 | NONE | NONE |

The defendant shall make the special assessment payment payable to Clerk, U.S. District Court, 102 Robert A. Grant Courthouse, 204 South Main Street, South Bend, IN 46601. The special assessment payment shall be due immediately.

## FINE

No fine imposed.

## RESTITUTION

No restitution imposed.

## FORFEITURE

The defendant shall forfeit the defendant's interest in the following property to the United States:

**1) DERYA ARMS VR-60 Shotgun CAL:12 SN: R101397; and**

**2) Assorted ammunition.**

USDC IN/ND case 3:22-cr-00036-JD-MGG  document 84  filed 09/21/23  page 6 of 6
Case Number: 3:22CR036-001
Defendant: MATTHEW RICE

Page 6 of 6

Name: <u>MATTHEW RICE</u>
Docket No.: <u>3:22CR036-001</u>

## ACKNOWLEDGMENT OF SUPERVISION CONDITIONS

Upon a finding of a violation of probation or supervised release, I understand that the Court may (1) revoke supervision, (2) extend the term of supervision, and/or (3) modify the conditions of supervision.

I have reviewed the Judgment and Commitment Order in my case and the supervision conditions therein.  These conditions have been read to me.  I fully understand the conditions and have been provided a copy of them.

(Signed)

_____        _____
Defendant                                               Date

_____        _____
U.S. Probation Officer/Designated Witness        Date

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

Sent to Client
3-17-2023 ak

UNITED STATES OF AMERICA

v.

Case No. 3:22-CR-36 JD

MATTHEW RICE

**OPINION AND ORDER**

The Defendant, Matthew Rice, has moved for the one count indictment against him to be dismissed. (DE 28.) Mr. Rice argues the indictment should be dismissed as the statute underlying the charge, 18 U.S.C. § 922(g)(1), is facially unconstitutional in light of the Supreme Court's recent decision in *New York State Rifle & Pistol Association v. Bruen*, 142 S.Ct. 2111 (2022). Further, Mr. Rice argues this statute is unconstitutional as applied to him as his underlying felony conviction is for a non-violent offense. For the following reasons, this motion will be denied.

**A. Background**

A federal grand jury returned a single count indictment against Mr. Rice, charging him with knowingly possessing a firearm on or about April 11, 2022, after having previously been convicted of a crime punishable by imprisonment for a term exceeding one year, in violation of 18 U.S.C. § 922(g)(1). (DE 10.) For the limited purpose of adjudicating this motion, the Court assumes these alleged facts to be true. The Court will reiterate that Mr. Rice remains presumed

innocent of the charges against him, and the Court takes no position on the question of his guilt, or the veracity of any factual allegation presented by the Government.[1]

### B. Legal Standard

A defendant can move before trial to dismiss an indictment for failure to state an offense. Fed. R. Crim. P. 12(b)(3)(B). A defendant can make such a motion on the basis that the charged offense is based on an unconstitutional statute. *United States v. Holden*, 2022 WL 17103509, *2 (N.D. Ind. Oct. 31, 2022) (internal citations omitted).

A constitutional challenge to a statute can be brought either as a facial challenge, or an as-applied challenge. Mr. Rice brings both types of challenges in his motion. To succeed on a facial challenge to the constitutionality of a statute, the moving party must show that the statute is unconstitutional in all applications. *City of L.A. v. Patel*, 576 U.S. 409, 415, 418 (2015). To succeed on an as-applied challenge, the moving party must show it is unconstitutional because the way it was applied to the particular facts of their case. *See United States v. Phillips*, 645 F.3d 859, 863 (7th Cir. 2011).

### C. Discussion

Mr. Rice's motion challenges the constitutionality of 18 U.S.C. § 922(g)(1). This statute provides that "[i]t shall be unlawful for any person ... who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year ... [to] possess in or affecting commerce, any firearm or ammunition." 18 U.S.C. § 922(g)(1). Mr. Rice argues that, as applied to him, § 922(g)(1) is unconstitutional as the Second Amendment does not permit the government to categorically bar individuals convicted of non-violent felonies from possessing

---

[1] The Government's response proffered additional, more specific, facts about the underlying conduct for the charge. In his reply, Mr. Rice strenuously objected to the Court considering these facts. This objection is moot as none of the additional proffered facts are necessary to adjudicate this motion.

App. 11

firearms. Mr. Rice's facial challenge argues that § 922(g)(1) violates the Second Amendment because there is no historical tradition of categorically barring felons from possessing firearms.

If a statute as applied to a defendant is constitutional, then a facial challenge to that statute should also fail as the statute will not be unconstitutional in all applications. *See United States v. Salerno*, 481 U.S. 739, 745 (1987). Therefore, the Court will first address Mr. Rice's as-applied challenge and only advance to his facial challenge if necessary.

### (1) *The Bruen standard for applying the Second Amendment*

Mr. Rice argues that this case must be dismissed because 18 U.S.C. § 922(g)(1) is unconstitutional under the Second Amendment to the United States Constitution. Therefore, the Court must analyze and apply the Second Amendment jurisprudence articulated by the Supreme Court.

The text of the Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme Court concluded that the Second Amendment confers "an individual right to keep and bear arms." 554 U.S. 570, 595 (2008). In reaching this conclusion, the Court recognized that "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Id.* at 626. Relevant to this case, the Court also warned that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill." *Id.* In a footnote, the Court went on to classify these traditional restrictions on firearm possession as a non-exhaustive list of "presumptively lawful regulatory measures." *Id.* at 627 n. 26.

In *Bruen*, the Supreme Court built upon its prior holdings to further define the scope of the Second Amendment right. The Court described its earlier Second Amendment decisions as

3

"recogniz[ing] … the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense." 142 S.Ct. at 2122. (citing *Heller*, 554 U.S. 570; *McDonald v. City of Chicago*, 561 U.S. 742 (2010)). The *Bruen* Court went on to lay out the methodology lower courts should utilize in reviewing Second Amendment challenges.

Prior to *Bruen*, the various circuit courts had largely converged on a two-step framework for analyzing Second Amendment challenges. *Id.* at 2126. At the first step, the government could justify its regulation by establishing that the challenged law regulates activity falling outside the scope of the Second Amendment right as originally understood. *Id.* At the second step, the courts analyzed how close the law comes to the core of the Second Amendment right and the severity of the law's burden on that right. *Id.*

In *Bruen* the Court stated that this test was "one step too many." *Id.* at 2127. The Court held that the first step of this framework was broadly consistent with *Heller*, but the "means-end scrutiny" of step two was inconsistent with the Second Amendment and the appropriate methodology centers on the "constitutional text and history." *Id.* at 2127–29. The Court articulated that the proper standard is as follows:

> "In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'"
> *Id.* at 2126 (quoting *Koningsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)).

Phrased another way, this test is composed of two prongs. The first prong is determining whether the plaint text of the Second Amendment covers the conduct at issue. *Id.* at 2129, 2134–

35. The second prong is determining whether the Government has established the regulation is consistent with the historical tradition of firearms regulation in the United States.[2] *Id.* at 2129–30.

The Supreme Court stated that the second prong would require the use of "historical analogies" and reasoning by analogy as is commonly done by lawyers and judges.[3] *Id.* at 2132. Consequently, in comparing a historical firearm regulation and a modern one, the key determination to be made is whether the two are "relevantly similar." *Id.* The *Bruen* Court did not provide an exhaustive survey of the features that could render regulations relevantly similar but found that *Heller* and *McDonald* outlined at least two: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132–33. Phrased differently, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are "'*central*'" considerations when engaging in an analogical inquiry." *Id.* at 2133 (quoting *McDonald*, 561 at 767 (itself quoting *Heller*, 554 U.S. at 599)).

---

[2] The Court would note that Seventh Circuit precedent appears to suggest that in the case of a challenge to a "presumptively lawful" regulation, the burden on prong two may shift from the Government to the challenger. *See Hatfield v. Barr*, 925 F.3d 950, 953 (7th Cir. 2019) ("If the subject were something other than a felon-dispossession statute, the Attorney General would bear the burden of justification"). As it is unclear whether that holding applies post-*Bruen*, neither party raised the issue in this case, and this question is not dispositive to this case; the Court applied the standard exactly as articulated in *Bruen* and placed the burden on the Government. The Court only notes this issue to encourage inquiry in future cases when this issue might be dispositive.

[3] Mr. Rice's motion seems to argue that if the regulation in question affects a societal problem that has persisted since the 18th century and there is no historical twin to the regulation, the Government loses and is unable to argue an analogical regulation existed. (DE 28 at 18–19.) Mr. Rice appears to back away from this proposition in his reply brief, however. (DE 38 at 10–12.) This is a wise concession. Mr. Rice's characterization of the *Bruen* test in his initial motion is plainly contrary to the text of *Bruen*, which requires a similar regulation but not a twin. 142 S.Ct. at 2133. Moreover, such a reading would render *Bruen*'s holding illogically restrictive. *See United States v. Kelly*, 2022 WL 17336578, *2 (M.D. Tenn. Nov. 16, 2022) ("The court's investigation [under *Bruen*], therefore, cannot be so simple as just comparing the modern law under review with the laws of a couple of centuries ago, like a redline comparison in a word processing application."); *United States v. Jackson*, 2023 WL 2242873, *12–13 (D. Md. Feb. 27, 2023) (same, collecting cases).

The Court further noted that this analogical reasoning is "neither a regulatory straitjacket nor a regulatory blank check." *Id.* While warning courts to not "uphold every modern law that remotely resembles a historical analogue," the Court also clarified that the Government is only obligated to identify a "historical *analogue*, not a historical *twin*." *Id.* (internal citation omitted). Therefore, even if a modern regulation is not a "dead ringer" for a historical precursor, it may be sufficiently analogous to pass constitutional muster.[4] *Id.*

### (2) *Mr. Rice's as-applied challenge*

The Court will begin with Mr. Rice's as-applied challenge. This challenge argues the government may not categorically disarm individuals who have been convicted of non-violent felonies.[5] For the following reasons, the Court disagrees and will reject Mr. Rice's as-applied challenge.

### (a) *The Bruen decision did not disturb existing Seventh Circuit precedent which forecloses Mr. Rice's as-applied challenge*

The first reason that Mr. Rice's as-applied challenge fails is because nothing in the *Bruen* decision indicates that it upsets existing circuit precedent upholding § 922(g)(1) as applied to non-violent felons.

---

[4] *Bruen* also stated that "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a *distinctly similar* historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." 142 S. Ct. at 2131 (emphasis added). Some courts have read this language as creating a more stringent standard of review for gun regulations aimed at societal ills dating to the Founding era, and Mr. Rice implicitly urges this Court to do the same. *See e.g. United States v. Holden*, 2022 WL 17103509, *3 (N.D. Ind. Oct. 31, 2022); *United States v. Lewis*, 2023 WL 187582, *4–5 (W.D. Okla. Jan. 13, 2023); (DE 38 at 11.) While the Court does not need to decide this issue, it will note its skepticism of this conclusion for the reasons noted by other sister courts. *See Jackson*, 2023 WL 2242873 at *12–13. To the extent there is a distinction between "distinctly similar" and "relevantly similar" it does not help Mr. Rice's case. The Court finds that the Government's proffered historical analogues would satisfy either of these standards.

[5] The Government does not dispute that the underlying felony conviction for Mr. Rice's instant § 922(g)(1) prosecution, based on his April 2022, possession of a firearm, is a non-violent crime.

6

App. 15

As previously mentioned, in *Heller*, the Supreme Court expressly noted that its decision should not be construed as casting doubt on the constitutionality of long-standing regulations such as prohibiting felons and the mentally ill from possessing firearms. 554 U.S. at 626. The Supreme Court subsequently reaffirmed its language regarding these presumptively lawful restrictions in *McDonald*, 561 U.S. at 786. Consequently, in reviewing post-*Heller* and *McDonald* challenges to the constitutionality of § 922(g)(1) the lower federal courts approached the regulation as "presumptively lawful" and uniformly upheld the statute including as applied to non-violent felons. *Kanter v. Barr*, 919 F.3d 437, 442 (7th Cir. 2019) (upholding § 922(g)(1) as applied to non-violent felons) (collecting cases). In *Bruen*, the Supreme Court once again reaffirmed these passages from *Heller* and *McDonald*.[6] On its face this language suggests that § 922(g)(1) is constitutionally valid and nothing in *Heller*, *McDonald*, or *Bruen* should be read to the contrary.

Mr. Rice devotes considerable energy to arguing that this language in *Heller* is mere dicta which this Court should disregard and that it has been superseded by the *Bruen* framework. The Court is unpersuaded by his arguments for three reasons. First, the Court is skeptical this language can be characterized as mere dicta given it served to limit the scope of the *Heller* decision and has been reaffirmed by the Supreme Court in *McDonald* and *Bruen*. The Supreme Court's repeated limitation of its Second Amendment jurisprudence to avoid disturbing "presumptively lawful" regulations might not be an unequivocal endorsement of those

---

[6] The majority opinion in *Bruen* does not expressly restate these passages, but stated its holding is "in keeping with Heller" which indicates it is consistent with *Heller* and *Heller's* progeny. 142 S.Ct. at 2126. Further, six of the nine Justices reaffirmed these passages from *Heller*, or their substance, in concurrences or dissents. *Id.* at 2157 (Alito, J. concurring) ("Nor have we disturbed anything that we said in Heller or McDonald … about restrictions that may be imposed on the possession or carrying of guns."), 2162 (Kavanaugh, J. concurring) (expressly reaffirming the language of *Heller*), 2189 (Breyer, J. dissenting) (same).

regulations' constitutionality, but it is clearly a warning to lower courts to exercise caution in applying the holdings of *Bruen*, *McDonald*, and *Heller*.

Second, dictum of the Supreme Court is generally binding upon lower courts. *Reich v. Continental Cas. Co.*, 33 F.3d 754, 757 (7th Cir. 1994). The Seventh Circuit has expressly recognized the importance and guiding authority of these passages from *Heller* in defining the scope of the Second Amendment. In *United States v. Skoien*, 614 F.3d 638, 640–41 (7th Cir. 2010) (en banc), the Seventh Circuit found that it was bound to respect the message conveyed by *Heller*'s language regarding longstanding, presumptively lawful restrictions. Specifically, the court found that these passages of *Heller* were instructions that "*some* categorical limits are proper," that those limits are part of the "original meaning" of the Second Amendment, and that filling in the details was to be left to the people's elected representatives. *Id.* Additionally, in an unpublished decision after *Bruen*, the Seventh Circuit rejected a facial challenge to § 922(g)(1) by a violent felon, in part by noting that the Supreme Court has declined to question the validity of laws barring felons from possessing firearms. *United States v. Gonzalez*, 2022 WL 4376074, *2 (7th Cir. Sept. 22, 2022) (unpublished). This recent decision, while unpublished, reflects that the Seventh Circuit does not consider *Bruen* to have disturbed existing precedent on laws regulating felon possession of firearms.

Third, Mr. Rice's position requires the Court to find that every other circuit and district court which has considered this language and concluded it is relevant to interpreting the scope of the Second Amendment, to have been wrong. The Court finds the possibility of such a systemic misapprehension to be unlikely. The Court finds this to be unlikely because of how many courts have concluded that these passages help define the scope of the Second Amendment and, conversely, because Mr. Rice has not cited to a single legal authority which shares his view. *See*

8

*e.g. Kanter*, 919 F.3d 442 (collecting pre-*Bruen* circuit court cases). In fact, as the Government notes in their response, § 922(g)(1) has been uniformly upheld by federal courts when challenged on the basis of *Bruen*. (DE 33-1 (appendix to Government response collecting post-*Bruen* cases upholding § 922(g)(1).) Therefore, the Court cannot agree with Mr. Rice that the passages of *Heller* describing the prohibition on felons possessing firearms as longstanding and presumptively lawful should be disregarded.

The Court is also unpersuaded by Mr. Rice's contention that the *Bruen* framework in some way vacated or superseded *Heller*. In addition to the previously discussed reasons, this interpretation is contrary to the explicit language of *Bruen* which stated the decision was "in keeping with *Heller*." 142 S.Ct. at 2126. Moreover, *Bruen* expressly reaffirmed the analytical method deployed by *Heller* and used it to resolve the challenge to the New York statute at issue. *Id.* at 2134–56. While *Bruen* certainly built upon *Heller* and provided further direction to the circuit courts on how to analyze Second Amendment challenges, the conclusion that *Bruen* superseded *Heller* is a step too far.

Therefore, the Court finds that *Bruen*, "in keeping with *Heller*" did not overturn or otherwise disturb the existing body of Seventh Circuit precedent concluding § 922(g)(1) is constitutional as applied to non-violent felons. 142 S.Ct. at 2129. The Court's conclusion on this point is shared by at least four sister courts within the Seventh Circuit and others across the nation. *United States v. Braster*, 2023 WL 2346282, *2 (N.D. Ind. Mar. 2, 2023) (holding the Second Amendment only protects law-abiding citizens and that the *Bruen* decision does not upset the precedent established by *Kanter*); *United States v. Price*, 2023 WL 1970251, *3–4 (N.D. Ill. Feb. 13, 2023) (upholding § 922(g)(1) as applied to non-violent felons based on pre-*Bruen* Seventh Circuit precedent); *United States v. Garrett*, 2023 WL 157961, *2–3 (N.D. Ill.

Jan. 11, 2023) (upholding § 922(g)(1) in part based on pre-*Bruen* Seventh Circuit precedent); *United States v. Gay*, No. 4:20-cr-40026, DE 412 (C.D. Ill. Dec. 5, 2022) (same); *see also United States v. Farley*, 2023 WL 1825066, *2–3 (C.D. Ill. Feb. 8, 2023) ("Properly understood, *Bruen* did not overturn, abrogate, or otherwise suggest that the longstanding prohibitions identified in *Heller*, including the prohibition of possession of firearms by felons, may no longer be lawful." (internal quotations omitted) (collecting cases for this proposition)). This means the Seventh Circuit's holding in *Kanter* upholding § 922(g)(1) as applied to non-violent felons remains valid and binding precedent which precludes Mr. Rice's as-applied challenge.[7] 919 F.3d 437. The failure of Mr. Rice's as-applied challenge means that his facial challenge to § 922(g)(1) fails as well. Therefore, Mr. Rice's motion must be denied.

Even if Mr. Rice's challenge was not foreclosed by circuit precedent, the Court finds, in the alternative, his challenge would fail on the merits of the *Bruen* test. To illustrate this, the Court will apply the two-prong analysis laid out in *Bruen*.

(b) *The Court assumes, without deciding, Mr. Rice is within the protective ambit of the Second Amendment*

The first step of a Second Amendment challenge is deciding whether the regulated conduct falls within the scope of the Second Amendment's plain text. *Bruen*, 142 S.Ct. at 2129–30. Therefore, the Court must determine whether Defendant, presumed for this motion to be a convicted individual as prohibited under § 922(g)(1), is among those protected by the Second Amendment.[8]

---

[7] The fact that Justice Barrett, who wrote a dissent favoring Mr. Rice's as-applied challenge position while on the Seventh Circuit, now sits on the Supreme Court is unavailing to Mr. Rice. (*See* DE 28 at 4.) Dissents are not binding precedent, and that fact does not change because their authors are elevated to the Supreme Court of the United States.

[8] The parties do not dispute that the mere conduct of possessing a firearm would be protected by the Second Amendment.

The Government argues that, as a convicted felon, Mr. Rice is not considered to be a part of "the people" for purposes of the Second Amendment as the Amendment's protections only extend to law-abiding citizens. As this Court noted in adjudicating another *Bruen* challenge, this is known as the civic virtue theory of the Second Amendment. *United States v. Posey*, 2023 WL 1869095, *5–6 (N.D. Ind. Feb. 9, 2023). There is historical evidence supporting this theory and the theory is at the heart of an ongoing debate among federal jurists.[9] *Id.* Further, while the Seventh Circuit has previously discussed the theory in at least three decisions prior to *Bruen*, it has never reached a definitive ruling on its merits. *Id.* Prior to *Bruen*, several federal circuit courts had endorsed this theory, at least as relating to felons. These courts concluded that felons, including non-violent felons, fell outside the scope of the Second Amendment's protection. *Kanter*, 919 F.3d at 447 (recognizing cases from several circuits reaching this conclusion). Following *Bruen*, two federal circuit court panels have discussed the civic virtue theory and reached opposite conclusions on its merits. *Compare Range v. Att'y Gen.*, 53 F.4th 262 (3d Cir. 2022) (vacated for rehearing en banc) (upholding § 922(g)(1) as applied to non-violent felons by finding felons are outside "the people" protected by the Second Amendment) *with United States v. Rahimi*, 59 F.4th 163 (5th Cir. 2023) [10] (rejecting the civic virtue theory and striking down 18 U.S.C. § 922(g)(8)); *United States v. Rahimi*, 2023 WL 2317796, *4–5 (5th Cir. Mar. 2, 2023) (same).[11]

---

[9] The Court incorporates by reference its prior discussion of the historical support for the civic virtue theory in *Posey*. This includes but is not limited to, the repeated characterization of the Second Amendment right as belonging to "law-abiding citizens" in *Bruen*. *See id.* at *6 n.5.

[10] The Court will note that the Attorney General has indicated the Department of Justice would seek further review of the decision. Department of Justice, Office of the Attorney General, Press Release No. 23-136, Statement from Attorney General Merrick B. Garland Regarding United States v. Rahimi (Feb. 2, 2023).

[11] The 5th Circuit has subsequently withdrawn and substituted the original opinion. The substituted opinion reaches the same conclusion, relying on the same reasoning as the original opinion.

App. 20

In reviewing *Bruen* challenges to federal firearms laws, our sister court, the Northern District of Illinois, has twice held that the Second Amendment's protection only extends to law-abiding citizens. *Price*, 2023 WL 1970251, at *4 (upholding § 922(g)(1) and distinguishing *Rahimi*); *United States v. Seiwert*, 2022 WL 4534605, *2 (N.D. Ill. Sept. 28, 2022) (upholding 18 U.S.C. § 922(g)(3)); *see also Garrett*, 2023 WL 157961 at *2 (upholding § 922(g)(1) and noting that the Supreme Court's Second Amendment jurisprudence suggests the right focuses on law-abiding citizens). While this motion was pending, two fellow judges within this District reached the same conclusion in rejecting challenges to § 922(g)(1). *Braster*, 2023 WL 2346282 at *2 (holding the Second Amendment only protects law-abiding citizens and that the *Bruen* decision does not upset the precedent established by *Kanter*) (Brady, J.); *see also United States v. Clark*, 2023 WL 2346284 (N.D. Ind. Mar. 2, 2023) (same); *United States v. Tribble*, 2023 WL 2455978, *2–3 (N.D. Ind. Mar. 10, 2023) (agreeing with *Braster* that the Second Amendment only protects law-abiding citizens) (Simon, J.).

Additionally, as the Government notes, there is support in the historical record that the right to bear arms was not understood, at the time the Second Amendment was ratified, to extend to felons. During the states' constitutional ratification conventions three proposals were made regarding restrictions in the right to bear arms which would have excluded felons. *United States v. Coombes*, 2022 WL 4367056, *6 (N.D. Okla. Sept. 21, 2022) ("no law shall be passed for disarming the people or any of them *unless for crimes committed*, or real danger of public injury from individuals.") (citing 2 Bernard Schwartz, The Bill of Rights: A Documentary History, 665 (1971) (discussing the Pennsylvania convention)); ("Congress shall never disarm any citizen, unless such as are or have been in actual rebellion.") (citing 1 Jonathan Elliot, The Debates in the Several State Conventions on the Adoption of the Federal Constitution, 326 (1836) (discussing

App. 21

the New Hampshire convention)); ("the right to keep arms extended only to 'peaceable citizens,' not to criminals") (citing Stephen P. Halbrook, The Founders' Second Amendment: Origins of the Right to Bear Arms, 206 (updated ed. 2008) (discussing the Massachusetts convention)).

Mr. Rice argues that these proposals are not persuasive because they were considered but ultimately rejected. Mr. Rice interprets this as a rejection of these provisions on the basis they were incompatible with the public understanding of the right to bear arms. While these proposals were not ultimately adopted, it was due to the Federalists opposition to the Bill of Rights as a whole and not objections to these specific proposals. *Coombes*, 2022 WL 4367056 at *6. Furthermore, in *Heller* the Supreme Court cited the Pennsylvania proposal as a "highly influential" "precursor" to the Second Amendment and favorably cited the New Hampshire and Massachusetts proposals as well. *Skoien*, 614 F.3d at 640 (quoting *Heller*, 554 U.S. at 604). While at least one sister court agrees with Mr. Rice's view that these proposals are unpersuasive, this Court respectfully disagrees. *See United States v. Hicks*, 2023 WL 164170, *4–5 (W.D. Tex. Jan. 9, 2023) (striking down § 922(n) as unconstitutional). The Court finds the commentary by the Supreme Court to be more instructive on the value of these proposals. Several other sister courts likewise agree that they provide useful guidance. *See e.g. Coombes*, 2022 WL 4367056 at *6; *United States v. Riley*, 2022 WL 7610264, *11 (E.D. Va. Oct. 13, 2022); *United States v. Collette*, 2022 WL 4476790, *6 (W.D. Tex. Sept. 25, 2022).

The Court would make an additional observation which suggests felons in particular would likely be excluded from the text of the Second Amendment. In discussing the ambit of the Second Amendment right in *Heller*, the Supreme Court initially describes it as belonging to "all members of the political community." 554 U.S. at 580. The Supreme Court made this comment in the context of concluding the Amendment confers an individual right and not just a civic right

and would later go on to characterize the right as one belonging to "law-abiding" and "responsible" citizens in the context of discussing what activity the right protects. *Id.* at 625, 365. Notwithstanding this context, opponents of the civic virtue theory argue the former language should be controlling and that the Second Amendment right extends beyond only the law-abiding citizenry. (*See e.g.* DE 28 at 15.)

However, when it comes to felons, there is a historical tradition of curtailing some core rights associated with being a member of the political community, namely voting and serving on a jury. *Kanter*, 919 F.3d at 453 n.3, 462 (Barrett, J. dissenting) (noting that history supports the restriction of voting rights and jury service to virtuous citizens); *see also United States v. Hill*, 2022 WL 17069855, *4 (S.D. Tex. Nov. 17, 2022) (ability to vote is a defining trait of membership in a political community); *Collette*, 2022 WL 4476790 at *6 (same).

The Court finds this language in *Heller* relating to members of the political community suggests corresponding restrictions on the ability of felons to bear arms are permissible. As a matter of basic reasoning it is hard to reconcile how the Framers of the Constitution could conclude that felons could not be trusted to wield pens in voting booths or jury rooms, but they simultaneously found them capable of wielding arms in the public square. *See Bruen*, 142 S.Ct. at 2134 (concluding the Second Amendment includes a right to carry handguns in public for self-defense).

In the Court's view, the fact the Framers excluded felons from core privileges afforded to members of the political community either suggests felons were not considered members of the political community, or even if they retained their membership post-conviction, their rights as members could nonetheless be considerably restricted without offending the Constitution. Either conclusion supports finding that the government has the power to restrict felons' ability to bear

App. 23

arms just as it restricts their ability to vote and, ergo, that § 922(g)(1) is constitutional. Multiple sister courts have reached the same conclusion, both before and after *Bruen*. *See e.g. United States v. Rozier*, 598 F.3d 768, 771 & n.5 (11th Cir. 2010) (analogizing felon-dispossession statutes to felon disenfranchisement laws and noting other examples of how a criminal conviction allows further restriction of constitutional rights); *Hill*, 2022 WL 17069855 at *4 ("Like voting rights, Second Amendment rights are a privilege afforded to the political community and can be forfeited upon demonstration that an individual does not, or no longer, fits the criteria to be a member of that political community."); *Collette*, 2022 WL 4476790 at *6 ("[I]f the definition of "the people" is consistent throughout the Constitution—and it has been historically constitutional to exclude those convicted of a crime from "the people" under Section 2, Article I [electorate for House of Representatives]—it would also be constitutional then to exclude those groups from the Second Amendment's kindred 'political right.'"); *Coombes*, 2022 WL 4367056 at *8 (noting that the right to bear arms and the right to vote were "intimately linked" in the minds of the Framers) (internal quotation omitted); *United States v. Johnson*, 2023 WL 2308792, *5–6 (S.D. Fla. Feb. 20, 2023) (upholding § 922(g)(1) as applied to non-violent felons based on the historical treatment of felons).

Ultimately, the Court does not need to decide this issue in this case, as there are adequate other grounds for deciding the motion. In light of this and the mixed guidance from the Seventh Circuit on the civic virtue theory, the Court will decline to decide the issue in this case. For the purposes of this motion the Court will assume, without deciding, Mr. Rice's possession of a firearm is facially covered by the protective ambit of the Second Amendment.

That being said, even if the previously discussed historical evidence will not be used to define the scope of the Second Amendment right, it is nonetheless useful for defining the scope

of the legislature's power to take that right away. *See Kanter*, 919 F.3d at 452 (Barrett, J. dissenting) (Concluding that analysis under the civic virtue theory and the broader theory "typically yield the same result; one uses history and tradition to identify the scope of the right, and the other uses that same body of evidence to identify the scope of the legislature's power to take it away."); *see also Coombes*, 2022 WL 4367056, *3–9 (concluding the defendant was a member of "the people" protected by the Second Amendment, but the historical tradition of excluding felons from the common law right to bear arms was evidence felons can be lawfully disarmed).

(c) *The Court finds that the government has carried its burden at the second prong of the Bruen test*

The Government argues that there are two types of historical laws which provide sufficiently similar historical analogies for disarming non-violent felons under § 922(g)(1). The first are historical laws which authorized capital punishment and estate forfeiture for persons convicted of felonies. The second are laws categorically preventing a group from possessing firearms based on a legislative judgment that the group could not be trusted to adhere to the rule of law. The Court finds the first proposed set of historical regulations is sufficiently analogous and therefore does not need to analyze the second set of historical regulations.

As previously stated, the key inquiry is "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Bruen*, 142 S.Ct. at 2133. In terms of burden, § 922(g)(1) prevents a certain, clearly defined, group of people from possessing a firearm. As the Seventh Circuit noted in *Skoien*, the original meaning of the Second Amendment indicates that some categorical disqualifications on firearm possession are permissible. 614 F.3d at 640–41. Thus, the question

in this case is whether this specific group is one of those permissible categorical disqualifications. The group in question is individuals who have been convicted of committing a felony, including non-violent felonies.

As the Government notes in great detail, felonies were historically considered the most serious category of crime and were punished the severe penalties of estate forfeiture and capital punishment. (DE 33 at 11–12 (citing 4 William Blackstone, *Commentaries on the Laws of England* 95 (1769); *see also Folajtar v. Att'y Gen.*, 980 F.3d 897, 904–05 (3d Cir. 2020) (upholding § 922(g)(1) as applied to non-violent felons)). These punishments were not restricted to violent felonies. States also treated non-violent crimes such as forgery and horse theft as capital offenses. *Medina v. Whitaker*, 913 F.3d 152, 158 (D.C. Cir. 2019) (citing Stuart Banner, *The Death Penalty: An American History* 18 (2002)). This was also true at the federal level. The First Congress, which drafted and proposed the Second Amendment, made a variety of felonies punishable by death including forging or counterfeiting a public security. *An Act for the Punishment of Certain Crimes Against the United States*, 1 Stat. 112–15 (1790). The use of these severe punishments on those convicted of violent and non-violent crimes shows that Mr. Rice's proposed distinction between violent and non-violent felonies is not supported by the historical record.[12]

As previously mentioned in this order, historical evidence suggests felons were not considered to be within the scope of the Second Amendment right and felons were also historically barred from voting or serving on a jury, thus depriving felons of core rights associated with being in a political community. *See supra* § C(2)(b). This evidence suggests, that

---

[12] As the Court notes elsewhere in this order, the disarmament of violent felons is also widely recognized as justified under the historical tradition of disarming dangerous individuals. *See infra* § C(3).

even if "the people" as contemplated by the Second Amendment was a broad class, felons were excluded from the group following their convictions or their rights as members of this class could be sharply curtailed. The conclusion that felons are one of the "groups that have historically been stripped of their Second Amendment rights," was also recognized by the Fifth Circuit in its *Rahimi* decision. 59 F.4th at 171; 2023 WL 2317796 at *4.

In light of this history, "it is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms." *Folajtar*, 980 F.3d at 905 (quoting *Medina*, 913 F.3d at 158). Further, given the exceptionally heavy burden these punishments place upon an individual, which inherently deprives the individual of their Second Amendment rights, disarmament under § 922(g)(1) is a comparatively lenient punishment and therefore is constitutionally permissible. The Court's conclusion is reinforced by the analysis of sister courts which have likewise found that felons were not considered within the common law right to bear arms by the Founders and there are analogous restrictions on the rights of felons which support their categorical disarmament. *See e.g. United States v. Carrero*, 2022 WL 9348792, *3 (D. Ut. Oct. 14, 2022); *Coombes*, 2022 WL 4367056 at *4–8 (providing a particularly rigorous historical analysis).

In terms of justification, it is undisputed that Congress enacted the exclusions in § 922 to "keep guns out of the hands of presumptively risky people." *United States v. Yancey*, 621 F.3d 681, 683 (7th Cir. 2010). Mr. Rice does not dispute § 922(g)(1) acts towards that end. Rather he argues it is overinclusive by including non-violent felons. However, the issue of overinclusion relates to the question of the burden imposed by the regulation and not justification. As previously discussed, the burden imposed by § 922(g)(1) is consistent with the history and tradition of the United States.

App. 27

Mr. Rice does not dispute the accuracy of the Government's description of the historical treatment of felons. Rather he presents two arguments on why the proposed analogies are not sufficiently similar.

First, Mr. Rice argues that estate forfeiture is not the same thing as extinguishing a possessory interest in firearms. Therefore, because "the Founding generation commonly meted out estate loss but never firearm loss [that] demonstrates the sacrosanct nature of the Second Amendment... ." (DE 38 at 25.) This argument is unpersuasive. Foremost, even if Mr. Rice was correct on this point, it does not address the other historical evidence relating to capital punishment and felon disenfranchisement which would be sufficient for the Government to carry its burden. Next, Mr. Rice misapprehends the nature of estate forfeiture. Estate forfeiture strips the subject of all of their property, which includes firearms. *See Folajtar*, 980 F.3d at 904. Therefore, imposing the penalty of estate loss inherently extinguishes the individual's possessory interest in any firearms they may have. There is also some historical evidence that felons were precluded from owning property or chattels, and this broad prohibition on possessing property inherently means they could also not possess a firearm. *Coombes*, 2022 WL 4367056 at *6.

Second, he argues the fact that capital punishment and estate forfeiture were "commonly used" is distinct from the loss of Second Amendment rights attendant with every felony conviction as provided for by § 922(g)(1). This argument is also unpersuasive. As an initial matter, Mr. Rice seems to be attempting to redefine the Government's burden to require the production of a "historical twin." Specifically, it appears Mr. Rice would only be satisfied if the Government produced evidence that every convicted felon in 1791 was executed or had their estate forfeited. That is not the burden imposed by *Bruen*. The fact that these types of punishments were in common use near the time of ratification indicates they were considered to

App. 28

be constitutionally permissible sanctions for persons convicted of felonies. Moreover, the historical record suggests that capital punishment for felonies was "ubiquitous" in the Founding era and was "the standard penalty for all serious crimes." *Medina*, 913 F.3d at 158 (quoting *Baze v. Rees*, 553 U.S. 35, 94 (2008) (Thomas, J. concurring) (other internal citations omitted)). This suggests that the historical record would satisfy Mr. Rice's heightened requirement as well as the *Bruen* standard.

The Court concludes that § 922(g)(1) imposes a similar or lesser burden on the Second Amendment right compared to historic regulations restricting the rights of felons, and the burden is comparably justified. Therefore the Court also concludes the Government has carried its burden at the second prong of the *Bruen* test and that § 922(g)(1) would be constitutional on this basis. Consequently, even if Mr. Rice's as-applied challenge was not foreclosed by binding Seventh Circuit precedent, it would also fail on the merits.

### (3) Mr. Rice's facial challenge

The Court will briefly discuss Mr. Rice's facial challenge. As a preliminary matter, the government argues that Mr. Rice is not entitled to bring a facial challenge to § 922(g)(1) based on Seventh and other circuit precedent precluding such challenges under the Second Amendment. (DE 33 at 5 (citing *Baer v. Lynch*, 636 Fed.Appx. 695, 697 (7th Cir. 2016) (itself citing *Skoien*, 614 F.3d at 645) (collecting cases))). In response Mr. Rice suggests that the *Salerno* standard described in the Government's argument has fallen out of favor and the Court should adopt *Rahimi*'s interpretation that Second Amendment facial challenges are permissible. (DE 38 at 6–7.)

The Court finds this issue to be moot. For the reasons discussed previously, Mr. Rice's as-applied challenge fails due to binding circuit precedent and because § 922(g)(1)'s prohibition

on non-violent felons possessing firearms is consistent with the history and tradition of firearms regulation in the United States. The failure of Mr. Rice's as-applied challenge means that his facial challenge fails as well. *Patel*, 576 U.S. at 418; *Salerno*, 481 U.S. at 745. The Court would note that in addition, and in the alternative, to the previously described reasons, Mr. Rice's facial challenge would also fail as his proffered legal authority disagrees with his position.

Mr. Rice's facial challenge advances the extraordinary proposition that Congress lacks the authority to disarm anyone on the basis of their felony conviction, regardless of how violent or dangerous they might be. After all a facial challenge requires the defendant to prove a statute is unconstitutional in all applications and some convicted felons who have been or will be disarmed are violent, dangerous, and otherwise downright disagreeable individuals. *Patel*, 576 U.S. at 418 (To succeed on a facial challenge to the constitutionality of a statute, the moving party must show that the statute is unconstitutional in all applications); *see e.g.* 18 U.S.C. §§ 1111 (homicide), 2242 (sexual abuse), 249 (hate crime acts). Mr. Rice indicates in this reply that he understands this is his burden and reaffirms that it is the position he is advocating. (DE 38 at 6–7.)

Mr. Rice cites no legal authority agreeing with this extraordinary position. The closest he comes is Justice Barrett's dissent in *Kanter* where she argues § 922(g)(1) is only constitutional as applied to violent felons. *Kanter*, 919 F.3d at 451 (Barrett, J. dissenting). However, this non-binding authority actually rejects the sweeping proposition in Mr. Rice's facial challenge. Justice Barrett eloquently opens her dissent with the observation "[h]istory is consistent with common sense: it demonstrates that legislatures have the power to prohibit dangerous people from possessing guns." *Id*. The class of dangerous people includes violent felons and § 922(g)(1), in her opinion, is constitutional when applied against them. *See id.* Justice Barrett also notes that

legislatures are empowered to categorically exclude persons who are dangerous or untrustworthy from possessing firearms as such regulations are "lineal descendants" of historical laws. *Id.* at 465.

Conversely, the position being advocated in Mr. Rice's facial challenge is not consistent with history or common sense. If history establishes that the government may *at the very least* disarm violent or dangerous felons as a class, then there are a considerable number of instances where § 922(g)(1) is constitutional.[13] Thus, Mr. Rice cannot establish the statute is unconstitutional in *all instances*. The academic works cited by Mr. Rice in support of his facial challenge are likewise unavailing. These works support the limited proposition that there is no historical twin to § 922(g)(1), but otherwise do not endorse his sweeping conclusion. Consequently, the Court finds Mr. Rice would fail to carry his burden in bringing a facial challenge.

### D. Conclusion

Accordingly, for the reasons previously stated, Mr. Rice's motion to dismiss the indictment is DENIED (DE 28).

SO ORDERED.

ENTERED: March 17, 2023

_____/s/ JON E. DEGUILIO_____
Chief Judge
United States District Court

---

[13] The Court would again note that *Kanter* is the most favorable authority for Mr. Rice's position. The remainder of the case law he cites in this section, for the limited description of describing the history of § 922(g)(1), ultimately uphold the challenged firearm restrictions. Interestingly, none of those cases used to describe the history of § 922(g)(1) actually involve challenges to that section. *N.R.A. v. A.T.F.*, 700 F.3d 185 (5th Cir. 2012) (challenge to §§ 922(b)(1), (c)(1)); *United States v. Booker*, 644 F.3d 12 (1st Cir. 2011) (challenge to § 922(g)(9)); *Skoien*, 614 F.3d 648 (same); *United States v. Chester*, 628 F.3d 673 (4th Cir. 2010) (same).